JEANNE HOPF *et al.*, Plaintiffs-Appellants, v. TOPCORP, INC., *et al.*, Defendants-Appellees.

First District (5th Division)   No. 87—2100

Opinion filed February 5, 1988.—Rehearing denied March 14, 1988.

PINCHAM, J., dissenting.

Richard Stillerman, of Evanston, and Marshal Patner, of Chicago, for appellants.

Roger W. Barrett, John M. Touhy, and Kevin C. Aiston, all of Mayer, Brown & Platt, of Chicago, for appellees.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

This is an interlocutory appeal, pursuant to Supreme Court Rule 307 (107 Ill. 2d R. 307) from an order which denied plaintiffs' request for a mandatory injunction. The action was brought to compel two Illinois for-profit corporations to comply with the provisions of the Illinois Open Meetings Act and the Illinois Freedom of Information Act. (Ill. Rev. Stat. 1985, ch. 102, par. 41 *et seq.*; Ill. Rev. Stat. 1985, ch. 116, par. 201 *et seq.* (the Acts).) On appeal plaintiffs contend that defendants have failed to meet their burden in demonstrating that they are not subject to the provisions of the Acts.

The following facts are pertinent to our disposition. Plaintiffs' motion for a preliminary injunction arose in their action seeking *mandamus*, declaratory, and injunctive relief to make meetings and documents open to the public pursuant to the Acts. The plaintiffs are citizens, residents, and taxpayers of Evanston, Illinois. The defendants are Topcorp, Inc. (Topcorp), and Research Park, Inc. (RPI), for-profit corporations organized pursuant to a statement of understanding dated February 5, 1986, between the City of Evanston (City) and Northwestern University to develop a research park on 22 acres of downtown Evanston property owned principally by the City and Northwestern. RPI is a wholly owned subsidiary of Topcorp.

The plan for the research park originated with Northwestern University, located in Evanston. The purpose of the research park is to offer companies a laboratory and other facilities for basic industrial research. Specifically, according to the statement of understanding, Topcorp and RPI were created to: (1) enhance the tax base of the City; (2) provide jobs for City residents; and (3) encourage new business development. On January 13, 1986, the Evanston city council authorized the City's participation in the development by passing a motion to adopt the statement. In February 1986, after three years of negotiations, the City and Northwestern entered into their statement of understanding.

The negotiation process was exhaustive. Discussions were held between the City and the University in 1982 and again in 1983. In 1982, the City had adopted a 20-year, mixed-use office development plan for downtown Evanston entitled "Downtown II." As part of this redevelopment plan, the City established a plan to pay for public improvements in streets, sewers, and other elements of the infrastructure in the area targeted for redevelopment. In December 1983, Northwestern University offered its land within the Downtown II area for a research park as a joint venture with the City. Northwestern's Basic In-

dustry Research Laboratory (BIRL), which has since been constructed on Northwestern University's property, was to be the anchor building of the development.

Pursuant to the terms of the statement of understanding, Topcorp and RPI were incorporated as for-profit corporations on June 17, 1986, under the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 1.01 *et seq.*). Topcorp was created primarily to purchase the land within the area designated as the research park and make it available for development. Topcorp has 200 shares of capital stock outstanding: 100 shares of class A and 100 shares of class B. The City owns all of the class A shares and Northwestern University owns all of the class B shares. Neither class may sell its shares without the consent of the other. There is no cumulative voting right for the election of directors and each class is entitled to elect three directors to Topcorp's six-member board of directors. The three City-designated Topcorp directors are the Evanston mayor, an alderman, and the City manager.

RPI was created to serve as the operating entity that is responsible for developing the park by negotiating for the sale or lease of the land to developers or users of the property. In addition, RPI has the task of promoting interest in the park, marketing it to prospective tenants, making management and maintenance arrangements, securing site development plans, and otherwise overseeing its operation. RPI issued 100 shares of common stock, all of which is owned by Topcorp. There is no cumulative voting for directors. The RPI board initially consists of 14, and thereafter up to 19, directors. The City and Northwestern University each designated seven initial directors. The City directors are appointed by the mayor with the consent of the city council.

The executive director of RPI is Ronald L. Kysiak, a private citizen whose salary is paid by Evanston Inventure, an entity made up of and funded largely by private local businesses and by a contribution from the City. The directors, who were appointed by the City, are an alderman, who is also chairman of the City's economic development committee, a member of the City's economic development committee, and a former mayor of the City. RPI currently has a staff of seven full- and part-time employees, on loan from Northwestern University. The budget is prepared by this staff. RPI has full control over its employees and retains the right to dismiss them or to hire additional employees. RPI's employees are not paid by Evanston; they are not subject to State regulations regarding public employees; and they are not eligible for State retirement or insurance benefits.

While it is true that the operation of the research park has not been subject to public meetings, its formation was a result of city council approval following a public meeting. The statement of understanding was publicly debated, voted on, and approved by the Evanston city council by a vote of 13 to 5. It was an open meeting in which nearly 50 private citizens spoke with regard to the project. In addition, in March of 1986 a resolution was passed by the city council, at a duly held public meeting, setting forth the criteria for exercising the City's right to elect half of the directors of the Topcorp and RPI boards. Pursuant to that resolution, the mayor, the City manager, and an alderman were to be elected to the Topcorp board. However, the members of the RPI board elected by the City were not limited to public officials.

In October 1986, Topcorp entered into a written agreement with Northwestern University and the City of Evanston to purchase, over time, the various parcels of land that will comprise the research park. This contract was submitted to the Evanston city council for its approval at an open meeting and was then signed. In this agreement, Topcorp agreed to pay the seller, which would be Northwestern University or the City of Evanston, the greater of the parcel's cost to the seller or its appraised value. The agreement further provided that the portion of the research park area that is currently owned by individuals or entities other than Northwestern University or Evanston will be acquired by Evanston either through purchase, eminent domain, or otherwise, and then sold to Topcorp.

While it is anticipated that the private sector will provide the majority of the funding for the actual development of the research park, the initial plans estimate public expenditures of almost $24 million. The testimony adduced below established that current projections indicate that the private sector will contribute $6 toward development for every $1 of public funding. Under the statement of understanding, the City of Evanston and Northwestern University are to equally absorb the operating costs incurred by Topcorp and RPI. In fiscal 1986, Evanston expended $50,000 for such expenses. RPI submitted a $500,000 operating budget to the City for fiscal 1987 and Evanston appropriated its $250,000 share after public debate and approval by the city council.

In February 1987, plaintiff Hopf had made a demand on Joel Asprooth, Evanston city manager and board member of Topcorp, for copies of the minutes of both Topcorp and RPI meetings. Plaintiff received no response to her demand. At a city council meeting on March 9, 1987, an alderman requested that Topcorp and RPI make

available to the public minutes of their board meetings. There was never a response to that request. On March 12, 1987, plaintiff made written demands of both Topcorp and RPI for minutes and other documents of the board, committee meetings and other corporate documents. In a letter dated March 17, 1987, RPI refused to comply with these requests.

On April 24, 1987, plaintiffs filed this suit seeking to have Topcorp and RPI declared public bodies subject to the Open Meetings Act and Freedom of Information Act. On plaintiffs' motion for a mandatory preliminary injunction, the circuit court held a hearing and heard the testimony we have summarized. On June 3, 1987, the court denied plaintiffs' motion. On July 6, 1987, plaintiffs filed this interlocutory appeal.

OPINION

■ As plaintiffs concede, in reviewing a case on a preliminary injunction, we must decide whether the trial court abused its discretion in granting or denying the injunction. (*Wilton Mortuary, Inc. v. Woolsey-Wilton Funeral Home, Ltd.* (1986), 140 Ill. App. 3d 1074, 489 N.E.2d 319.) Plaintiffs are not entitled to injunctive relief unless they establish by a preponderance of the evidence the following four elements:

> "(1) [T]he existence of a protectable right, (2) irreparable harm should the injunction not be forthcoming, (3) no adequate remedy at law, and (4) a likelihood of success on the merits." *Lindsey v. Board of Education* (1984), 127 Ill. App. 3d 413, 418-19, 468 N.E.2d 1019.

■ With regard to the first element, as listed above, if defendants are found to be a public entity there is no question that plaintiffs have a protectible right. (See *People ex rel. Hopf v. Barger* (1975), 30 Ill. App. 3d 525, 332 N.E.2d 649.) In addition, it is not just the meetings of defendants that would be subject to the Open Meetings Act. Deliberations would be subject to the provisions of the Acts as well. (*People ex rel. Difanis v. Barr* (1980), 83 Ill. 2d 191, 414 N.E.2d 731.) As such, plaintiffs clearly have established a protectible right, if defendants are found to be a public entity, insofar as meeting the first element of successful injunction.

With regard to the second element, it is true that if Topcorp is ultimately found to be subject to the Open Meetings Act, the violation thereof is both irreparable and continuing. Additionally, there is no dispute from defendants that the plaintiffs have met their burden with regard to the third element.

■ The crux of our inquiry lies within the fourth element—a likelihood of success on the merits. The Illinois Open Meetings Act requires only that public business be conducted publicly. (*People ex rel. Difanis v. Barr* (1980), 83 Ill. 2d 191, 414 N.E.2d 731.) The purpose of the Act is to "provide disclosure of information about government affairs and its representatives' official acts." (*Carrigan v. Harkrader* (1986), 146 Ill. App. 3d 535, 496 N.E.2d 1213.) Thus, the question presented is whether Topcorp is, in essence, a public entity performing a public function.

The Illinois Open Meetings Act defines a "public body" to include:

> "all legislative, executive, administrative or advisory bodies of the state, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees or commissions of this State, and *any subsidiary bodies* of any of the foregoing including but not limited to committees and subcommittees which are supported in whole or in part by tax revenue, or which expend tax revenue, except the General Assembly and committees or commissions thereof." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 102, par. 41.02.)

The Illinois Freedom of Information Act contains a substantially identical definition of a "public body." See Ill. Rev. Stat. 1985, ch. 116, par. 202(a).

■ Plaintiff does not claim specifically that defendants Topcorp and RPI constitute legislative, executive, administrative, or advisory bodies of State or local government. Therefore, the relevant consideration is whether the two corporations are "subsidiary bodies" of the City of Evanston as that term is used in both Acts.

The considerations pertinent to the determination of whether an entity is a "subsidiary body" are contained in *Rockford Newspapers, Inc. v. Northern Illinois Council on Alcoholism & Drug Dependence* (1978), 64 Ill. App. 3d 94, 380 N.E.2d 1192, a case which all parties agree is controlling. The *Rockford* court found that the legal nature of an entity and the independence of the board of directors and employees of the entity from direct governmental control are extremely significant factors in determining whether an entity constitutes a "subsidiary body." The amount of public funds is also to be considered. However, a large percentage of public funding alone will not create a "subsidiary body"; the court may consider the nature of the financial interest. Finally, the court must look to the degree of government control and the nature of the functions performed by the entity. While general supervision does not transform the supervised company into a

subsidiary of the government, substantial, day-to-day supervision might indicate otherwise. *Rockford*, 64 Ill. App. 3d at 96, 380 N.E.2d at 1193.

■ Plaintiffs argue that Topcorp is public in nature under the *Rockford* standards. Specifically, plaintiffs note that the statement of understanding between Evanston and Northwestern University provides for the corporation's creation, establishing its public and private functions, setting up a structure for stock ownership and control by the City. Further, the public membership on defendant's corporations' boards and the public responsibilities of those public members are mandated by a city council resolution. For these reasons, plaintiffs suggest that Topcorp is subject to the Open Meetings Act.

On the other hand, defendants note that both Topcorp and RPI were organized as for-profit corporations, and their respective shareholders intend and hope that the corporations will make a profit. Further, the corporations were designed to implement the proprietary—as opposed to governmental—aspects of the development plan. In addition, defendants assert that plaintiffs' contentions regarding the supposed purposes of the corporations confuse the functions of the corporations with motives of one of the two corporate shareholders. While Evanston decided to invest in the corporations because the research park was expected to increase the tax base, create new jobs and encourage business development, its motivation as a shareholder cannot be used to convert the proprietary functions of the corporations into public, governmental functions.

In reviewing the preliminary evidence before it with respect to the factors set out in *Rockford*, the trial court specifically determined that the formal legal nature of Topcorp and RPI is that they are privately incorporated. The court also determined that the respective corporations' boards and employees are independent of direct governmental control. Further, Evanston's investment in the corporations and Northwestern University's decision to invest therein did not create those privately incorporated entities. The court determined that the principal function of Topcorp was to purchase land from Evanston and Northwestern. RPI's principal function was to oversee the private development of the real estate. While the court below made no specific findings regarding the amount of public funding, the record discloses that it is projected that the private sector will provide the majority of the funding for the actual development of the research park.

As to the degree of governmental control exercised, the trial court found that Evanston's supervision is general in nature, as is Northwestern University's. Specifically, the supervision is intended

only to protect the investments made and to see that the venture becomes self-sustaining. The record supports the above determinations. Based on its considerations, the trial court denied the motion for a preliminary injunction. We see no reason to disturb that determination.

■ Ordinarily, a preliminary injunction serves the purpose of preserving the status quo until the trial court can consider the case on the merits (*Hill v. Village of Pawnee* (1973), 16 Ill. App. 3d 208, 305 N.E.2d 740); however, granting the injunctive relief sought in this case would alter the status quo. As previously stated, a preliminary injunction is an extraordinary remedy and should be granted with the utmost care. (*G. A. Carney, Ltd. v. Brzeczek* (1983), 117 Ill. App. 3d 478, 453 N.E.2d 756.) Thus, an order granting or denying a preliminary injunction will not be reversed unless the appellant can show that the entry of the order constituted an abuse of the lower court's discretion. (*Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599, 229 N.E.2d 536.) While we are prohibited from suggesting the outcome of the ongoing declaratory action below (*Lindsey v. Board of Education* (1984), 127 Ill. App. 3d 413, 468 N.E.2d 1019), the matter before us is a review of an order denying a motion for preliminary injunction and plaintiffs have not met the applicable stringent burden which must be met before such an extraordinary measure is ordered. Our determination is limited to a finding, based on the evidence as it presently stands, that the denial of injunctive relief was not an abuse of discretion.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MURRAY, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. The defendants, Topcorp, Inc., and Research Park, Inc., are clearly public entities, and they just as clearly perform public functions, for which reasons they are also, just as clearly, subject to and governed by the clear mandates of the Illinois Open Meetings Act (Ill. Rev. Stat. 1985, ch. 102, par. 41 *et seq.*) and the Illinois Freedom of Information Act (Ill. Rev. Stat. 1985, ch. 116, par. 201 *et seq.*). Plaintiffs, Jeanne Hopf, Barbara R. Sipowicz and Mark N. Kraemer, therefore, are also just as clearly entitled to their *mandamus*, and to the declaratory and injunctive requested relief that

defendants' documents and meetings be made open to the public, pursuant to the provisions of said Open Meetings and Freedom of Information Acts.

The legislature of the State of Illinois found and declared in the Real Property Tax Increment Allocation Redevelopment Act (Act) (Ill. Rev. Stat. 1985, ch. 24, par. 11—74.4—2(a)), *inter alia*, "that there exist in many municipalities within this State blighted conservation and industrial park conservation areas ***; that the conservation areas are rapidly deteriorating and declining and may soon become blighted areas ***; [and] that as a result of the existence of blighted areas and areas requiring conservation, there is an excessive and disproportionate expenditure of public funds, inadequate public and private investment ***. *** [T]he industrial park conservation areas include under-utilized areas which, if developed as industrial parks, will promote industrial and transportation activities, thereby reducing the evils attendant upon involuntary unemployment and enhancing the public health and welfare of this State." The legislature found and declared in subparagraph (b) of said section of the Act, *inter alia*, that "[t]he eradication of blighted areas and treatment and improvement of conservation areas and industrial park conservation areas by redevelopment projects is hereby declared to be essential to the public interest." (Ill. Rev. Stat. 1985, ch. 24, par. 11—74.4—2(b).) Subparagraph (c) provides, in part, that "all surplus tax revenue are turned over to the taxing districts in redevelopment project areas and all said districts benefit from the removal of blighted conditions, the eradication of conditions requiring conservation measures, and the development of industrial parks." Ill. Rev. Stat. 1985, ch. 24, par. 11—74.4—2(c).

Section 11—74.4—3 of the Tax Increment Allocation Redevelopment Act defines blighted area, conservation area, industrial park, industrial park conservation area, lab or surplus municipality, municipality, obligations, payment in lieu of taxes, redevelopment plan, redevelopment project, redevelopment project area, redevelopment project costs, taxing districts, taxing districts' capital costs and vacant land.

The powers and duties of municipalities are conferred by section 11—74.4—4 of the Act, which provides, *inter alia*, that a municipality (1) may by ordinance approve redevelopment plans and redevelopment projects, and designate redevelopment project areas; (2) make and enter into contracts necessary to the implementation of its redevelopment plan and project; and (3) acquire property by purchase, donation, lease or eminent domain or own, convey, lease, mortgage or

dispose of land or other property. Sections 11–74.4–5 and 11–74.4–6 provide for and require notice of public hearings on an ordinance which proposes the designation of a redevelopment project area or which approves a redevelopment plan or project, and for protest and objections thereto or changes in the plan or project. Section 11–74.4–7 provides for the issuance of obligations for project costs and the succeeding three sections of the Redevelopment Act, respectively, set forth the provision for tax increment allocation financing—special tax allocation fund, surplus funds—termination of projects, payments to municipalities—calculations—special tax allocation funds, and equalized assessed value of property within project area and payment of property costs—revenues from municipal property.

There was substantial land on the edge of downtown Evanston owned by the City of Evanston (the City), Northwestern University and others which contained many deteriorating and substandard buildings. The City of Evanston and Northwestern decided to utilize this land for a research park. To do so and to facilitate the acquisition of the land and its development, in January 1985 the Evanston city council, pursuant to the authority conferred by the aforesaid Tax Increment Allocation Development Act, adopted a redevelopment plan and enacted a tax increment financing district ordinance. The city council found that the land had not been subject to growth and development through investment by private enterprise and would not be reasonably expected to be developed without the adoption of the redevelopment plan. The city council also found that approval of the redevelopment plan was necessary "for the promotion and protection of the health, safety, morals and welfare of the residents of the City of Evanston." The aforesaid Real Property Tax Increment Allocation Redevelopment Act conferred condemnation power upon the City of Evanston, which was indispensable for the acquisition of the land for the redevelopment plan.

The following year, on January 13, 1986, the Evanston city council adopted a statement of understanding which authorized the City's participation in the development plan to develop a research park on the aforementioned land. The city council's statement of understanding provided for the creation of two for-profit corporations, Topcorp, Inc., and its wholly owned subsidiary, Research Park, Inc.

The statement of understanding provided that Topcorp and Research Park, Inc., were to be created to promote several public purposes, namely, the development of a research park on land owned mainly by the City to improve the City's tax base, to provide jobs for residents of the City and to encourage the development of new busi-

nesses.

Under the statement of understanding, Topcorp was to purchase the land to effectuate the development of the research park, and Research Park, Inc., was to promote and market the research park, arrange for the management and maintenance of the research park and execute any other responsibilities that may be assigned to it by Topcorp. Research Park, Inc., was also responsible under the statement of understanding for providing adequate job-training programs, compliance with affirmative action laws, implementing a minority business enterprise plan, compliance with all applicable safety, noise, smoke, dust, radiation, order and disturbance laws, prohibiting munitions research in the research park and adherence to the research park's physical environment design.

The statement of understanding also provided for a parking plan which required Evanston's and Northwestern's continued participation.

Topcorp, Inc., and Research Park, Inc., were incorporated on June 17, 1986, under the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, pars. 1.01 though 17.05) as for-profit corporations, as specified in the Evanston city council's statement of understanding.

Topcorp issued 100 shares of class A stock, all owned by the City of Evanston, and 100 shares of class B stock, all owned by Northwestern University. The owners cannot sell their shares without the other's consent. Topcorp has three directors appointed and replaced by the City of Evanston and three directors are appointed and replaced by Northwestern University. There is no cumulative voting right for the election of directors. Evanston's three appointed directors to Topcorp are appointed by Evanston's mayor with the approval of the Evanston city council. Evanston's three Topcorp directors are Evanston's mayor, Evanston's city manager and an Evanston alderman, who also is a member of the city council's economic development committee.

Research Park, Inc., issued 100 shares of common stock, all of which are owned by Topcorp. Research Park, Inc.'s, board of directors initially consisted of 14 members (but the number was later increased to 19). Research Park, Inc., like Topcorp, has no cumulative voting directors. The City of Evanston and Northwestern each appointed seven initial directors of Research Park, Inc. Evanston's seven directors are appointed to the Research Park, Inc., board by the mayor with the consent of the city council, three of whom are: (1) an alderman who is also chairman of the city economic develop-

ment committee; (2) a former mayor of Evanston; and (3) a recently retired member of the Evanston economic development committee. The statement of understanding further provided that the City of Evanston fill any vacancy of a Research Park, Inc., director appointed by the City, and, upon expiration of any City director's term, the City may reelect that director or a new director. Thus, the statement of understanding requires that the City of Evanston appoint one-half of the board of directors of Topcorp and also one-half of the board of directors of Research Park, Inc., during the life of the two corporations. The statement of understanding also specifies the criteria for the appointment of the public members as directors and demands that these directors remain loyal to the city and the city's goal.

Most of the land of the research park site, 22 acres in Evanston's downtown area, was owned by the City of Evanston, and under the statement of understanding, the City is obligated to purchase all the land for the site which is not already owned by the City or Northwestern University. The original plans for the research park called for a public expenditure of almost $24 million for which the City will issue bonds, which must be approved by the administration and works committee, one of the City of Evanston's three standing committees. The City thus far has expended a substantial amount of taxpayers' funds for the capitalization and operation of Topcorp and Research Park, Inc. The statement of understanding required that the City of Evanston and Northwestern University equally pay the operating costs of Topcorp and Research Park, Inc. In 1986, the City paid $50,000 as its share of the two corporations' operating expenses and $250,000 as the City's share of Research Park, Inc.'s, 1987 operating cost. The City increased the City real estate transfer tax, effective April 1987, and designated a quarter of a million dollars annually of these tax proceeds for payment of costs relating to the operation of Research Park, Inc.

The research park redevelopment enterprise is a for-profit undertaking by and for the City of Evanston and Northwestern. The City's share of the profits produced by Topcorp is determined by the City's percentage share of the value of the property conveyed to Topcorp and because the City owns most of the land in the research park site, the City's share in Topcorp's profits is calculated to be in excess of 50%. The City's share of interest payable by Topcorp is likewise based on the City's share of the value of the properties transferred to Topcorp. On dissolution of Topcorp, the City's share of its assets is to be governed by the City's percentage share of the value of the

property conveyed to Topcorp.

Ron Kysiak is the executive director of Research Park, Inc., and he is also the director of Inventure, which is an economic development company partially financed on an annual basis by the City of Evanston.

Topcorp's budget must be approved by its board, one-half of whom, as previously pointed out, are publicly appointed and who by mandate of a City resolution are the mayor, the City manager and an alderman. Research Park, Inc.'s, budget is subject to advance approval of Topcorp's board, one-half of whom, also as previously pointed out, are appointed by Evanston's mayor with the consent of the Evanston city council.

With a $26 million grant from the Federal government, Northwestern University has constructed on its land adjacent to the research park a Basic Industry Research Laboratory, which will be exclusively owned and operated by Northwestern.

Plaintiffs urge that in order to respond to, pursue and protect the concerns of the Evanston citizens, the City aldermen need to know if the developer is complying with the environment, the hiring of minority business and other provisions of the statement of understanding; that aldermen need to monitor contracts and subcontracts in the research park to avoid possible conflicts of interest and because of these current concerns arising out of a news article that an architectural firm, in which a City alderman is a member and stockholder, received a contract for architectural work from the developer. On May 4, 1987, six Evanston aldermen sent written requests to the members of the board of directors of Topcorp and Research Park, Inc., to open their meetings and make the corporation's documents available to them in order that they would have the information necessary for them to intelligently, accurately, informatively and knowingly vote on matters pertinent to the research park, particularly the Evanston city council's appropriation of public funds to the two corporations. On March 12, 1987, plaintiff, Jeanne Hopf, in writing demanded of Topcorp and Research Park, Inc., minutes of the board and committee meetings and other reports and documents of the two corporations. Hopf's demand on Topcorp was rejected by a letter, dated April 10, 1987, written on official City of Evanston stationery and signed by Joan W. Barr, Mayor of Evanston, in her capacity as president of Topcorp.

During the March 9, 1987, Evanston city council meeting Alderwoman Evelyn Sherman Raden requested that Topcorp and Research Park, Inc., make public the minutes of their board meetings. Demands were made of J. Asproath, Evanston's city manager and a

Topcorp board member, for copies of the director's minutes of meetings of Topcorp and Research Park, Inc. It was undisputed that Topcorp and Research Park, Inc., had drafted many documents in connection with the research park, *i.e.*, board and committee meetings minutes, corporate reports of costs, financing construction, maintenance, management, minority hiring, environmental contact and private developer's participation. None of the deliberations or meetings of the board of directors or committees of Topcorp or Research Park, Inc., have been open to the public and all the above-mentioned requests for information, documents, etc., of the two corporations have been denied. It is further uncontested that Research Park, Inc., shortly intended to execute a formalized agreement with a developer for the entire research park and that the contents and provisions of that agreement have not been and will not be made available or known to the public or the Evanston city council members who are not on the board of directors of Topcorp or Research Park, Inc.

At the time the Evanston city council adopted the legislation for creation of the research park, two corporations and the letter of understanding, and approved the research park development plan, the council was not asked to exempt and did not consider exempting the two corporations, Topcorp and Research Park, Inc., from the provisions of the Illinois Freedom of Information Act or the Public Meetings Act.

The defendants, Topcorp and Research Park, Inc., contend that they are not subject to the provisions of the Illinois Freedom of Information Act or the Illinois Open Meetings Act, even though both corporations:

(1) are creations of the Evanston city council;

(2) were formed with Evanston's taxpayers' money;

(3) were created to promote and protect the health, safety, morals and welfare of the residents of Evanston, to provide jobs for Evanston residents, to encourage new Evanston business development and to improve Evanston's tax base;

(4) have issued stock, one-half of which is owned by the City of Evanston;

(5) are managed by a board of directors, one-half of whom are chosen from Evanston's elected public officials;

(6) operate on Evanston's taxpayers' money;

(7) have thus far received $50,000 in 1986 and $250,000 in 1987 of Evanston's taxpayers' money;

(8) will be the ultimate recipient of at least $24 million of Evanston's taxpayers' money:

(9) are located on Evanston's taxpayers' land;

(10) are located in part on private land subsequently acquired by the corporations through purchase and condemnation;

(11) are to share the corporate profits with the City of Evanston; and

(12) are to share their dissolution assets with the City of Evanston.

### THE FREEDOM OF INFORMATION ACT

The pertinent provisions of the Freedom of Information Act (Ill. Rev. Stat. 1985, ch. 116, par. 201 *et seq.*), are sections 1, 2, 3 and 11, and are as follows:

### Public policy—Legislative intent:

"Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest." Ill. Rev. Stat. 1985, ch. 116, par. 201.

### Definitions:

" 'Public body' means any legislative, executive, administrative, or advisory bodies of the State, state universities and colleges, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees, or commissions of this State, and *any subsidiary bodies of any of the foregoing* including but not limited to committees and subcommittees which are supported in whole or in part by tax revenue, or which expend tax revenue.

\* \* \*

'Public records' means all records, reports, forms, writings, letters, memoranda, books, papers, maps, photographs, microfilms, cards, tapes, recordings, electronic data processing records, recorded information and all other documentary materials, regardless of physical form or characteristics, having been prepared, or having been or being used, received, possessed or under the control of any public body. 'Public records' includes

\*\*\* information relating to any grant or contract made by or between a public body and another public body or private organization." Ill. Rev. Stat. 1985, ch. 116, par. 202.

Inspection or copying of public records—Request procedures:

"Each public body shall make available to any person for inspection or copying all public records \*\*\*." Ill. Rev. Stat. 1985, ch. 116, par. 203.[1]

Denial of request for public records—Injunctive or declaratory relief:

"(a) Any person denied access to inspect or copy any public record by the head of a public body may file suit for injunctive or declaratory relief.

(b) Where the denial is from the head of a public body of the State, suit may be filed in the circuit court for the county where the public body has its principal office or where the person denied access resides.

(c) Where the denial is from the head of a municipality or other public body, except as provided in subsection (b) of this Section, suit may be filed in the circuit court for the county where the public body is located.

(d) The circuit court shall have the jurisdiction to enjoin the public body from withholding public records and to order the production of any public records improperly withheld from the person seeking access." Ill. Rev. Stat. 1985, ch. 116, par. 211.

THE OPEN MEETINGS ACT

The pertinent provisions of the Open Meetings Act (Ill. Rev. Stat. 1985, ch. 102, par. 41 *et seq.*), are sections 1, 1.02, 2, 2.01 and 3, and are as follows.

Public policy:

"It is the public policy of this State that the public commissions, committees, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of this Act that their actions be taken openly and that their deliberations be conducted openly." Ill. Rev. Stat. 1985, ch. 102, par. 41.

Definitions:

"For the purposes of this Act:

---

[1]This section of sections 3 and 7 contains exceptions and exemptions which are inapplicable to the case at bar.

'Meeting' means any gathering of a majority of a quorum of the members of a public body held for the purpose of discussing public business.

'Public body' includes all legislative, executive, administrative or advisory bodies of the state, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees or commissions of this State, and any *subsidiary bodies of any of the foregoing* including but not limited to committees and subcommittees which are supported in whole or in part by tax revenue, or which expend tax revenue, except the General Assembly and *committees or commissions thereof.*" Ill. Rev. Stat. 1985, ch. 102, par. 41.02.

All official meetings open to the public—Exceptions:

"All meetings of public bodies shall be public meetings ***." Ill. Rev. Stat. 1985, ch. 102, par. 42.[2]

Time and place:

"All meetings required by this Act to be public shall be held at specified times and places which are convenient to the public." Ill. Rev. Stat. 1985, ch. 102, par. 42.01.

Noncompliance—Civil actions—Relief—Fees and costs:

"Where the provisions of this Act are not complied with, or where there is probable cause to believe that the provisions of this Act will not be complied with, any person, including the State's Attorney of the county in which such noncompliance may occur, may bring a civil action in the circuit court for the judicial circuit in which the alleged noncompliance has occurred or is about to occur, or in which the affected public body has its principal office, prior to or within 45 days after the meeting alleged to be in violation of this Act." Ill. Rev. Stat. 1985, ch. 102, par. 43.

I agree with the majority that on the instant appeal "the question presented is whether Topcorp [or Research Park, Inc.] is, in essence, a public entity performing a public function," and I also agree with the majority's analysis that on the instant appeal "the relevant consideration is whether the two corporations [Topcorp and Research Park, Inc.] are 'subsidiary bodies' of the city of Evanston as that term is used in both [the Freedom of Information and the Open Meetings] Acts." (170 Ill. App. 3d at 91.) Although the majority

---

[2]This section of section 2 and section 2A contains exceptions which are inapplicable to the case at bar.

has aptly stated the question presented and the relevant consideration on review, the majority, nevertheless, whether intentionally or inadvertently, has adroitly avoided stating, directly or inferentially, whether the two corporations are subsidiary bodies of the City of Evanston, or whether the two corporations are performing a public function. The majority resolves the instant appeal by merely reiterating a portion of the trial court's findings regarding a portion of the corporations' functions. The majority thereupon concludes: (1) that the trial court did not abuse its discretion in denying plaintiffs' requests for injunctive and other relief; and (2) because "plaintiffs have not met the applicable stringent burden which must be met before such an extraordinary measure is ordered." (170 Ill. App. 3d at 93.) I disagree with both these conclusions of the majority.

First, the evidence overwhelmingly established that Topcorp and Research Park, Inc., are subsidiary bodies of the City of Evanston. The two corporations were created pursuant to legislation of the Evanston city council. The City of Evanston owns one-half of each corporation. The City of Evanston designates one-half the members of the board of directors of each corporation, who must be Evanston elected public officials and who must remain loyal to the City of Evanston. The corporations were formed with the funds of Evanston taxpayers. The City of Evanston has already spent in two years $300,000 of the taxpayers' funds to operate and maintain the two corporations and the City is further obligated to expend an additional $24 million of the taxpayers' money for the corporations' operation and maintenance. The corporations acquired City-owned land on which the corporate functions are to be fulfilled. The City is to share in the corporate profits and dissolution assets and the City of Evanston and its public officials are obligated to oversee and monitor both corporations to protect and pursue the public interest. It is clear that the two corporations are subsidiary bodies of the City of Evanston and are public bodies. *Board of Trustees v. Freedom of Information Comm'n* (1980), 181 Conn. 544, 436 A.2d 266; *Seghers v. Community Advancement, Inc.* (La. App. 1978), 357 So. 2d 626; *Raton Public Service Co. v. Hobbes* (1966), 76 N.M. 535, 417 P.2d 32; *Westchester Rockland Newspapers, Inc. v. Kimball* (1980), 50 N.Y.2d 575, 408 N.E.2d 904, 430 N.Y.S.2d 574.

Second, the evidence likewise overwhelmingly established that the two corporations are to perform public functions. They were expressly created for such purposes, *i.e.*, "for the promotion and protection of the health, safety, morals and welfare of the residents of the city of Evanston," to provide jobs for City residents, to encour-

age new business development, to improve the City's tax base, promote job training, protect the environment, acquire minority participation, prohibit munitions research, provide parking facilities and transfer a blighted urban downtown area into a redeveloped, economically productive site. These are clearly public functions. The majority's ostensible reliance on the corporations' "proprietary—as opposed to governmental—aspects of the development plan" (170 Ill. App. 3d at 92) is illusory, superficial and is a distinction without a difference as to whether the corporations are to perform public functions.

The trial court and the majority's reliance on *Rockford Newspapers, Inc. v. Northern Illinois Council on Alcoholism and Drug Dependence* (1978), 64 Ill. App. 3d 94, 380 N.E.2d 1192, is misplaced. In *Rockford Newspapers*, plaintiff's news reporter was excluded from a regular meeting of the defendant, Northern Illinois Council on Alcoholism and Drug Dependence. Plaintiff filed a *mandamus* action against defendant to compel plaintiff's admission to defendant's meetings under the Open Meetings Act (Ill. Rev. Stat. 1975, ch. 102, par. 41 *et seq.*). The trial court denied plaintiff relief. The question presented for review was whether the defendant, a private, not-for-profit organization, funded primarily by government agencies and required to comply with numerous government regulations, was subject to the provisions of the Open Meetings Act. In affirming the trial court, the *Rockford* court relied on the absence in *Rockford Newspapers* of the very ingredients that are abundantly prevalent in the case at bar. The *Rockford* court stated and held:

> "Plaintiff maintains that NICADD (defendant) is a government subsidiary because 90% of its funding comes from government grants and contracts and because its activities and programs are regulated and monitored by Federal, State and local governments *** [and] because it operates programs that are the statutory responsibility of the Illinois Dangerous Drugs Commission.
>
> Defendant argues that it is not a subsidiary because of its formal status as a private corporation and because its personnel have no direct relationship with the governments in question. NICADD is incorporated as a private, not-for-profit organization. Its board of directors is selected pursuant to its own by-laws and is neither elected nor appointed by any government official.
>
> * * *
>
> NICADD's formal legal nature and the independence of both its board of directors and its employees from direct govern-

ment control are extremely significant factors." 64 Ill. App. 3d at 95-96.

The creation, management, financing and purpose of NICADD in *Rockford Newspapers* are not remotely analogous to Topcorp and Research, Inc. *Rockford Newspapers* is therefore not on point, analogous or controlling in the case at bar.

The trial court erroneously ruled in the case at bar that: "The evidence is clear that Topcorp, Incorporated, and Research Park, Inc., are private entities ***." The trial court, however, did not articulate the factual or legal basis upon which it predicated this conclusion. Assuming, however, as the trial court concluded, that the two corporations were "private entities," such did not thereby necessarily preclude them from also being "subsidiary bodies" of the City of Evanston for the purpose of the Open Meetings Act and the Freedom of Information Act.

In a democratic society the taxpaying public is entitled to know the purpose for which its tax dollars are being spent. In a democratic society the public has a right to know in what enterprises its government is engaged. In a democratic society the public has a right, indeed a duty, to regiment, regulate, oversee and control its government's activities. In a democratic society government is prohibited, with exceptions inapplicable here, from functioning and engaging in secrecy from its citizens. The legislature of this State has enhanced that prohibition and made government more open and accessible to its citizens by enactment of the Open Meetings Act and the Freedom of Information Act. Totalitarian governments exist and flourish on secrecy and on uninformed and ignorant citizenries. The painful and bitter but profitable lessons learned from secrecy in governmental affairs in the Watergate, the Iran-Contra and the Greylord contemporary debacles should not be forgotten or ignored. Secrecy has no legitimate place in routine, everyday democratic government. I would reverse the trial court and order it to grant the disclosure relief plaintiffs requested.