DENVER POST CORPORATION, a Colorado corporation, d/b/a The Denver Post, and Don S. Knox, Plaintiffs–Appellees,

v.

STAPLETON DEVELOPMENT CORPORATION, a Colorado non-profit corporation; and Richard L. Anderson, in his capacity as president and chief executive officer of the Stapleton Development Corporation, Defendants–Appellants.

No. 99CA1260.

Colorado Court of Appeals,
Div. III.

Nov. 24, 2000.

Rehearing Denied Jan. 11, 2001.

Faegre & Benson LLP, Thomas B. Kelley, Steven D. Zansberg, Christopher P. Beall, Denver, CO, for Plaintiffs–Appellees.

Arnold & Porter, Alfred T. McDonnell, Eugene L. Hohensee, Peter J. Krumholz, Denver, CO, for Defendants–Appellants.

Opinion by Justice ERICKSON.*

Defendants, Stapleton Development Corporation and Richard L. Anderson, president and chief executive officer of Stapleton Development Corporation (collectively SDC), appeal from the trial court's order determining that the Colorado Open Records Act applied to documents received by SDC from private corporations. We affirm.

Plaintiffs, the Denver Post Corporation, d/b/a The Denver Post, and Don S. Knox, a reporter for The Denver Post, commenced this action following SDC's refusal to allow them to inspect and copy bid proposals submitted to SDC for the redevelopment of the former Stapleton International Airport. The bid proposals were submitted by four real estate development firms that were named as finalists for the position of "development partner" with SDC.

In response to plaintiffs' action, SDC asserted that because it is a private, nonprofit Colorado corporation it was not subject to the Colorado Open Records Act (CORA), see § 24–72–201, et seq., C.R.S.2000. Nevertheless, because SDC, as a matter of policy and in accordance with its bylaws, allows access to its books and records in a manner that is generally consistent with the provisions of the CORA, it agreed to make available all information which it would be required to disclose if it were a covered entity.

SDC asserted, in accordance with § 24–72–204(3)(a)(IV), C.R.S.2000, of the CORA, it could withhold "confidential, commercial [and] financial data" submitted by the finalists in their bid proposals. SDC stated that it would redact that information from the requested documents and would explain and justify its redactions to the court *in camera.* SDC contended that provision of the redacted documents would moot this action and requested that the court dismiss it with prejudice.

Plaintiffs objected to SDC's assertion that the case would be moot and urged that, in any event, the issue of costs and attorney fees under § 24–72–204(5), C.R.S.2000, needed to be resolved by the court. Plaintiffs contended that the redactions went far beyond what was allowed under § 24–72–204(3)(a)(IV). Accordingly, they asserted that SDC still had not complied with the requirements of the CORA and that, thus, the case was not moot.

After conducting a two-day hearing on whether SDC was subject to the CORA and whether the information redacted from the documents was properly withheld under § 24–72–204(3)(a)(IV), the court issued a written order finding that SDC was subject to the CORA, that the documents requested by plaintiffs contained confidential commercial or financial information, and that SDC had properly withheld that information. Notwithstanding that finding, the court determined that, except for certain information supplied by the "development partner," the redacted information should be released upon the earlier of the following dates: (1) when the "Option Agreement" between SDC and the "Development Partner" was final and enforceable; or (2) November 30, 1999.

SDC then brought this appeal.

## I. Background

The Stapleton site consists of 4700 acres of land owned by the City and County of Denver. Pursuant to Denver's City Charter, authority to manage, supervise, and control this land was vested in the Manager of Aviation, who served as the head of the City's Department of Aviation. The Stapleton Development Plan (also known as the "Green Book") was created as a blueprint for the redevelopment of the Stapleton site. Approximately 70 percent of the cost of the Stapleton Development Plan was borne by the Stapleton Redevelopment Foundation, a private organization, with the remaining 30 percent borne by Denver. The Stapleton Development Plan was subsequently adopted by the Den-

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3),

and § 24–51–1105, C.R.S.2000.

ver City Council as an amendment to the City's Comprehensive Plan.

The Stapleton Development Plan discussed various methods by which the development of the Stapleton site could proceed. It ultimately recommended the formation of a "nonprofit development corporation," which entity was charged with implementing the Stapleton Development Plan.

In accordance with that recommendation, SDC was incorporated by the Denver Urban Renewal Authority (DURA) as a private nonprofit corporation to facilitate the redevelopment of land at Stapleton. SDC has eleven directors, nine of whom are appointed by the Mayor of Denver, with the remaining two appointed by DURA. All eleven directors must be approved by a formal vote of the Denver City Council. In addition, the by-laws of SDC provide that two ex-officio members of SDC's board of directors are officials of Denver, including the Manager of Aviation and a member of the Denver City Council.

A Master Lease and Disposition Agreement was subsequently negotiated between Denver and SDC. The agreement had a term of fifteen years and outlined the responsibilities of both Denver and SDC. Pursuant to that agreement, SDC was expressly characterized as an independent contractor. The agreement also provided that SDC's employees were neither employees of Denver nor entitled to any benefits Denver provided to its employees.

## II. Mootness

Initially, we reject SDC's contention that the trial court erred in not dismissing the action as moot because it had voluntarily complied with the CORA by providing redacted copies of the bid proposals to plaintiffs.

A case becomes moot when relief, if granted, would have no practical legal effect upon the existing controversy. *Van Schaack Holdings, Ltd. v. Fulenwider*, 798 P.2d 424 (Colo.1990).

In this action, there were outstanding issues regarding whether SDC had complied with the CORA by providing the redacted documents, whether the redactions SDC made went beyond what was allowed under the CORA, and whether plaintiffs were entitled to their costs and attorney fees under the CORA.

Moreover, even if we assume that SDC voluntarily complied with the CORA, such compliance does not necessarily moot plaintiffs' challenge. *See United Air Lines, Inc. v. City & County of Denver*, 973 P.2d 647 (Colo.App.1998) (a defendant's voluntary cessation of a challenged practice does not deprive a court of its power to determine the legality of the practice because there is no certainty that the defendant will not resume the challenged practice once the action is dismissed), *aff'd*, 992 P.2d 41 (Colo.2000), *cert. denied*, 530 U.S. 1274, 120 S.Ct. 2741, 147 L.Ed.2d 1006 (2000).

We therefore conclude that the trial court did not err in failing to dismiss the action as moot.

## III. Applicability of the CORA

SDC next contends that the trial court erred in finding that it was subject to the CORA. We disagree.

In interpreting the CORA, our primary task is to give effect to the legislative purpose underlying the Act, looking first to the plain language employed by the General Assembly. *Zubeck v. El Paso County Retirement Plan*, 961 P.2d 597 (Colo.App.1998).

The CORA must be construed as a whole and we must give consistent, harmonious, and sensible effect to all of its parts. A construction that leads to an absurd result will not be followed. *Freedom Newspapers, Inc. v. Tollefson*, 961 P.2d 1150 (Colo.App. 1998).

Section 24–72–203(1)(a), C.R.S.2000, of the CORA provides, in pertinent part, that:

> All public records shall be open for inspection by any person at reasonable times, except as provided in this part 2 or as otherwise provided by law. . . .

At the time this action was brought, "public records" was defined as including:

> [A]ll writings made, maintained, or kept by the state, any agency, institution, or politi-

cal subdivision of the state, or that are described in section 29–1–902, C.R.S., and held by any local government-financed entity for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds.

Colo. Sess. Laws 1996, ch. 42, § 24–72–202(6)(a)(I) at 141.

"Political subdivision," as used in the CORA means and includes "every county, city and county, city, town, school district, special district, and housing authority within this state." Section 24–72–202(5), C.R.S. 2000.

SDC argues that because the plain language of the CORA does not include organizations other than public entities, we may not expand the language of the statute to include private entities. We are not persuaded.

Initially, we note that the failure specifically to include a particular type of agency within the definitional sections of the CORA has not precluded such an agency from being subject to its provisions if exclusion of the agency would be contrary to the General Assembly's intent in enacting the CORA. For example, in *Dawson v. State Compensation Insurance Authority*, 811 P.2d 408 (Colo. App.1990), a division of this court held that the State Compensation Insurance Authority (SCIA) was subject to the CORA even though it was not specifically included within the statutory definition of "political subdivision" in § 24–72–202(5). The court determined that SCIA was a statutorily created political subdivision of the state which, for purposes of the CORA, was indistinguishable from other political subdivisions to which the CORA applied.

Additionally, the *Dawson* court noted that in response to the supreme court's narrow construction of the term "institution" in *Uberoi v. University of Colorado*, 686 P.2d 785 (Colo.1984), which held that the University of Colorado was not subject to the CORA, the General Assembly amended the CORA expressly to include the University of Colorado and other state institutions of higher learning. *See* § 24–72–202(1.5), C.R.S.2000. Accordingly, based on the General Assembly's rejection of the supreme court's strict construction of the CORA in *Uberoi*, together with the stated purpose of allowing inspection of public records of political subdivisions of the state, the court concluded that the CORA applied to the SCIA despite its not being expressly included with the statutory definition of "political subdivision."

The *Dawson* court further noted that the phrase "means and includes" in the definition of "political subdivision" is self-contradictory because the term "means" restricts and the term "includes" extends the meaning of the term "political subdivision ." Thus, the court concluded that a consistent and harmonious result with the remaining provisions of the CORA would be achieved if the definition of "political subdivision" was interpreted to include the SCIA.

Similarly, in *Zubeck v. El Paso County Retirement Plan, supra,* a division of this court addressed whether the El Paso County Retirement Plan was subject to the CORA. The court noted that the Retirement Plan was created through enabling legislation that authorized counties to create retirement plans. The court also noted that the Retirement Plan had availed itself of public entity tax and health benefits, and had used county purchasing accounts, facilities, and seal. In addition, the Retirement Plan had received money from the public entities that had participated in the Retirement Plan and that the Retirement Plan was authorized to levy a retirement tax on all taxable property within the county. Accordingly, because of these characteristics, the court concluded that the Retirement Plan operated as an agency or instrumentality of the county and was thereby subject to the CORA.

Although not expressly stated in either *Dawson* or *Zubeck,* the appellate court in those cases considered a number of factors in determining whether the entity was subject to the CORA, including the purpose for which the entity was formed, whether the entity had availed itself of the public entity's resources and facilities, and whether the entity could levy a tax. *See Dawson v. State Compensation Insurance Authority, supra; Zubeck v. El Paso County Retirement Plan, supra; see also Freedom Newspapers, Inc. v.*

*Denver & Rio Grande Western R.R. Co.,* 731 P.2d 740 (Colo.App.1986) (contracts between an agency of the City of Colorado Springs and a railroad for the transportation of coal were subject to the CORA).

Other jurisdictions that have considered whether a private entity is subject to that jurisdiction's open records act have considered similar factors. *See Perry County Development Corp. v. Kempf,* 712 N.E.2d 1020 (Ind.Ct.App.1999) (county development corporation); *Marks v. McKenzie High School Fact–Finding Team,* 319 Or. 451, 878 P.2d 417 (1994) ("fact-finding team" selected by a private association of school administrators to investigate, report on, and make recommendations with respect to certain aspects of the operation of a high school); *News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So.2d 1029 (Fla.1992) (architectural firm hired to perform services for public agency); *Buffalo News, Inc. v. Buffalo Enterprise Development Corp.,* 84 N.Y.2d 488, 619 N.Y.S.2d 695, 644 N.E.2d 277 (1994) (municipal development corporation); *State ex rel. Guste v. Nicholls College Foundation,* 564 So.2d 682 (La.1990) (non-profit corporation); *Hopf v. Topcorp, Inc.,* 170 Ill.App.3d 85, 122 Ill.Dec. 629, 527 N.E.2d 1 (1988) (development corporation); *see also CIBA–GEIGY Corp. v. Mathews,* 428 F.Supp. 523, 526–27 (S.D.N.Y. 1977) (court noted that the federal courts, in determining whether an entity is an agency under the federal Freedom of Information Act, "have not applied a precise standard but have adopted a functional analysis, examining numerous factors including whether the organization has the authority in law to perform the decisionmaking functions of a federal agency and whether its organizational structure and daily operations are subject to substantial federal control."); *see generally* A. Nadel, Annotation, *What Constitutes an Agency Subject to Application of State Freedom of Information Act,* 27 A.L.R.4th 742 (1984).

In *News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc., supra,* the Florida supreme court set forth a nonexclusive list of nine factors to be considered in determining whether a private entity was subject to the state's open records act. These factors examined the level of the public agency's involvement with the private entity and included: (1) the level of public funding; (2) whether there had been a commingling of funds; (3) whether the activity was conducted on publicly owned property; (4) whether services contracted for were an integral part of the public agency's chosen decision-making process; (5) whether the private entity was performing a governmental function or a function which the public agency otherwise would perform; (6) the extent of the public agency's involvement with, regulation of, or control over the private entity; (7) whether the private entity was created by the public agency; (8) whether the public agency has a substantial financial interest in the private entity; and (9) for whose benefit the private entity was functioning.

As noted, SDC was incorporated by DURA, which itself is a body corporate and politic under statute. *See* §§ 31–25–103(1) & 31–25–104(1)(b), C.R.S.2000. The articles of incorporation specified that SDC was formed to facilitate the redevelopment of the Stapleton site.

In addition, Denver maintained control over SDC's board of directors through its power to appoint nine of the eleven SDC directors, all of whom had to be approved by a formal vote of the Denver City Council. Further, SDC's board of directors included the Planning Director for Denver and the Mayor's Chief of Staff. Ex-officio members of the board included Denver's Manager of Aviation and a member of the Denver City Council. *See Colorado Ass'n of Public Employees v. Board of Regents,* 804 P.2d 138 (Colo.1990) (court held that University Hospital could not be characterized as a private hospital because it was founded by state officials, not private individuals).

Pursuant to the Master Lease and Disposition Agreement, SDC had the option to purchase 2930 acres of land at the Stapleton site to develop and resell to third parties. Control of this land had been vested in the Manager of Aviation for Denver and any proceeds from its sale were to be used by Denver to pay down its indebtedness for the

new airport. SDC also leased all property at the Stapleton site that was not otherwise excluded.

The Stapleton Development Plan envisioned a mixed-use community capable of supporting more than 30,000 jobs and 25,000 residents. It was characterized as one of the largest urban infill projects in the country.

SDC was charged with the responsibility to implement the Stapleton Development Plan which had been incorporated into Denver's Comprehensive Plan. SDC had the authority, among other things, to prepare and adopt site infrastructure plans, establish a transportation management organization, develop plans for short and long-term water and wastewater management strategy, to develop storm drain improvements, and to commence design of a park and golf course.

In 1997, Denver paid SDC $4,492,000 in connection with the redevelopment effort. In 1998, SDC received $7,604,305 from Denver. Denver also provided SDC funding in the amount of $400,000 a year for three years for planning and developing park space within the Stapleton site.

Based on the record before us, and considering the factors set forth in *News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc., supra*, we conclude that SDC is subject to the CORA. It is apparent that Denver retains significant control over SDC through its appointment and approval of SDC's board of directors and its provision of substantial funds to SDC. In addition, SDC oversees the management and disposition of over 2900 acres of publicly owned property in addition to other acreage that is designated for parks and open space. Denver benefits from the disposition of this property in several ways, including that the proceeds are used to reduce its indebtedness on bonds issued for the new airport. Never-theless, SDC, rather than Denver, will be in charge of developing and implementing numerous infrastructure improvements for the Stapleton site, and ultimately, disposing of this property.

Based on such factors, we conclude that SDC is effectively an instrumentality of Denver with regard to the development of the Stapleton site. *See News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc., supra; Dawson v. State Compensation Insurance Authority, supra; Zubeck v. El Paso County Retirement Plan, supra.* Accordingly, inclusion of SDC within the meaning of "political subdivision" based on such status would be consistent with the General Assembly's intent that all public records shall be open for inspection. *See* § 24–72–201, C.R.S.2000; *Dawson v. State Compensation Insurance Authority, supra.*

Given the scope the project, its public nature, and especially that it involves the development of several thousand acres of publicly owned lands over several decades, it would be inappropriate to insulate the decision-making process from public scrutiny merely because control of the development was given to a non-governmental entity.

Therefore, we conclude that the trial court did not err in determining that SDC was subject to the CORA.

The order is affirmed.

Chief Judge HUME and Judge DAILEY, concur.