## CIRCUIT COURT OF THE CITY OF RICHMOND

George B. Little

v.

Virginia Retirement System et al

Case No. HB-1298

BY JUDGE ROBERT L. HARRIS, SR.

August 5, 1992

The Petitioner brought this suit alleging that the Respondents, the Virginia Retirement System ("VRS"); Systems Holding, Inc. ("SHI"); RF&P Corp.; Mark Finn, both individually and in his capacities as a trustee of VRS, a director of SHI, and Chairman of the Board of RF&P; and Jacqueline Epps, both individually and in her capacities are Chairperson of the Board of VRS, and as a director of SHI and RF&P, violated certain provisions of the Virginia Freedom of Information Act ("VFOIA"). This is the second suit the Petitioner has brought against one of the defendants, VRS, alleging violations of the VFOIA. Following the presentation of the Petitioner's case in

chief, the Court granted a motion to strike the evidence against Mark Finn,[1] but all other Respondents remain involved in this suit.

The relationships among VRS, SHI, and RF&P are critical to the decisions here. The Constitution of Virginia requires the General Assembly to "maintain a state employees retirement system to be administered in the best interest of the beneficiaries thereof." Va. Const., art. X, § 11. Accordingly, the General Assembly established the Virginia Retirement System. *See* Va. Code Ann. §§ 51.1–100 to 51.1–168 (Michie 1991). The Board of Trustees of VRS is appointed by the Governor, *see* § 51.1–109 and is established as the trustee of VRS funds. *See* § 51.1–114. In that fiduciary position, the Board is authorized to invest in "every kind of property and every kind of investment" while using the "judgment of care . . . . which men of prudence, discretion, and intelligence exercise in the management of their own affairs." § 51.1–116.

As a portion of its investments, VRS held shares of stock in RF&P. By statute, the VRS Board of Trustees was entitled to appoint a number of directors to the Board of RF&P, proportionate to the percentage of RF&P sock held by VRS. *See* § 51.1–151. In March of 1990, VRS held approximately twenty percent of the total RF&P stock and, therefore, was entitled to appoint two directors to the RF&P Board. The VRS Board appointed two of its own members, Jacqueline Epps and Mark Finn, to fill those seats.

In June of 1991, as part of its plan to acquire ownership of *all* RF&P stock, VRS established Systems Holding, Inc., as a wholly-owned subsidiary of VRS for the sole purpose of holding the RF&P stock acquired. Currently, the RF&P stock represents the sole asset of SHI. As the creator of, and sole stockholder in SHI, VRS appointed the entire Board of Directors of SHI. Until November of 1991, that Board consisted of two people, Jacqueline Epps and Mark

---

[1] Although, in response to Finn's Motion to Strike, the Petitioner *expressly* conceded only that his evidence as to *willful* violations by Mark Finn was insufficient, the Court interpreted that concession as reaching to any specific violation by Finn. Subsequently, a dispute arose as to the breadth of the Court's ruling on Finn's Motion to Strike. However, all parties agreed that any injunctive relief which the court directed at any Board upon which Finn served would effectively enjoin him as well; therefore, even if the Petitioner inadvertently conceded more than he intended, or if the Court misunderstood his concession, the ability of the Court to grant appropriate relief will be unaffected.

Finn. Once VRS acquired one hundred percent ownership of the RF&P stock, it was statutorily authorized to appoint the full membership of the RF&P Board of Directors. Accordingly, the "non-public" members of the RF&P Board resigned, and the VRS Board authorized its subsidiary, SHI, which formally held those shares, to appoint the new RF&P Board members. To that end, Ms. Epps and Mr. Finn, acting both as Board members of SHI and as the only remaining Board members of RF&P, appointed the full RF&P Board. Because of the links between VRS, SHI, and RF&P, the Petitioner alleges not only continued violations of the Virginia Freedom of Information Act by VRS, but also argues that SHI and RF&P are subject to the VFOIA, and that they, too, have violated the Act.

Prior to the hearing on March 29–30, 1992, the Court confronted two preliminary questions: first, whether SHI, a wholly-owned subsidiary corporation of VRS, was subject to the VFOIA; second, whether RF&P, a corporation one hundred percent of whose stock is now owned by VRS through its subsidiary SHI, is also covered by the VFOIA. Only one of those issues remains genuinely in dispute. At the outset of the March hearing, SHI conceded that it is subject to the VFOIA and agreed that SHI would continue to obey the Act, as it had done voluntarily since December, 1991. While an analysis of the circumstances making SHI subject to the VFOIA will prove helpful in evaluating the Act's applicability to RF&P, the Court need not dwell on SHI's status.

Thus, the issues which the Court must address and the order in which it will address them are as follows:

I. Is the RF&P Corporation a "public body" subject to the Virginia Freedom of Information Act?

II. Has the Virginia Retirement System denied the Petitioner any of his rights under the Virginia Freedom of Information Act, and if so, is the injunctive relief sought by the Petitioner appropriate?

III. Has Systems Holding, Inc., denied the Petitioner any of his rights under the Virginia Freedom of Information act, and if so, is the injunctive relief sought by the Petitioner appropriate?

IV. Has RF&P Corp. denied the Petitioner any of his rights under the Virginia Freedom of Information Act, and if so, is the injunctive relief sought by the Petitioner appropriate?

V. Has Jacqueline Epps, in her individual capacity, willfully violated the Virginia Freedom of Information Act?

VI. Are any of the parties in this suit entitled to an award of attorneys' fees?

I. *Is the RF&P Corporation a "public body" subject to the Virginia Freedom of Information Act?*

The court begins with this question in order to determine what entities are subject to the VFOIA, what violations occurred, if any, and what remedies are appropriate if violations did occur. Because the Court finds that the peculiar relationship between the VRS Board of Trustees and the RF&P Board of Directors makes the later subject to the VFOIA, the Court need not decide the more difficult questions of whether circumstances exist in which a private corporation can become merely an arm of the state and whether such a relationship alone would make the private corporation subject to the Act.

The essence of the Petitioner's claim is that once the Virginia Retirement System acquired one hundred percent of the stock of RF&P, the latter, formerly private, effectively became a state entity covered by the Virginia Freedom of Information Act. The Petitioner grounds this argument in the public policy principles which gave birth to the VFOIA:

> It is the purpose of the General Assembly by providing this chapter to ensure to the people of this Commonwealth ready access to records in the custody of public officials and free entry to meetings of public bodies wherein the business of the people is being conducted. This chapter recognizes that the affairs of government are not intended to be conducted in an atmosphere of secrecy, since at all times, the public is to be the beneficiary of any action taken at any level of government.

Section 2.1–340.1 (1987) (currently denoted as subsection (A) without recitation of the policy language in 1992 Supp.).

In furtherance of this stated policy, the VFOIA is to "be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government. Any exception or exemption from applicability shall be narrowly construed in order that *no thing which should be public may be hidden from any person.*" Section 2.1–340.2(B) (1987 & Supp. 1992) (Emphasis added).

The Petitioner has, during the course of these proceedings, frequently reminded the Court of this liberal construction mandate. To

that end, the Petitioner presented evidence of the significant value of the VRS investment in RF&P (over $500,000,000), of its importance to the public in general, and VRS participants in particular, and of the public benefit of ready access to information about how that investment is being managed. The liberal construction language, however, does not empower this Court to act in a legislative capacity by determining what *should* be public. The Court's role is limited to interpreting, with a certain mandated liberality, what the General Assembly *intended* to be public. Even with the mandate to construe the statute liberally, this Court does not have unrestrained latitude to go beyond the language of the statute. In *Roanoke City School Bd. v. Times-World Corp.*, 226 Va. 185, 307 S.E.2d 256 (1983), for example, the court addressed whether, under the version of the VFOIA in effect at that time, the definition of "meetings" was broad enough to include telephone conference calls. The court declared, "[T]here is no common-law right of the public or press to attend the meetings of governmental bodies . . . . [I]n the absence of a statutory prohibition, there can be no legal or constitutional objection to a governmental body transacting certain business by means of a telephone conference call." *Id.* at 191, 307 S.E.2d at 258.

In that vein, RF&P argues that any application of the Freedom of Information Act to RF&P would extend that Act beyond the intent of the legislature. In support of this argument, RFP has referred the Court to House Bill No. 643, introduced in the 1992 session of the General Assembly, which would have expressly extended the definition of "public body" to include corporations in which at least ninety percent of the stock is owned by the Commonwealth. The bill was referred back to the Committee on General Laws, where no further action was taken before the 1992 session ended. RF&P argues that non-passage of that bill by the legislature reveals a lack of intent on its part to cover such corporations as RF&P, especially since the General Assembly had, in recent sessions, passed laws which allowed for the establishment of such a single purpose investment corporation as SHI, *see* Va. Code Ann. § 51.1–116, and allowed the Commonwealth to transfer its shares of RF&P stock to the VRS. *See id.* § 2.1–187 (currently re-enacted without reference to RF&P stock, in 1992 Supp.). However, legislative intent is an elusive creature in Virginia, particularly where such intent is grounded in legislative non-action. Although RF&P contends otherwise, strong inferences

cannot be drawn from the legislative activity involved here. This contrasts with the situation in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1951), in which the U. S. Supreme Court based its findings that the President lacked the power to seize steel companies, in large part, on an extensive history of congressional action in such matters:

> Under the urgency of telephone and coal strikes in the winter of 1946, Congress addressed itself to the problems raised by "national emergency" strikes and lockouts. The termination of wartime seizure powers on December 31, 1946, brought these matters to the attention of Congress with vivid impact. A proposal that the President be given powers to seize plants to avert a shutdown where the "health or safety" of the nation was endangered, was thoroughly canvassed by Congress and rejected. No room for doubt remains that the proponents as well as the opponents of the bill which became the Labor Management Relations Act of 1947 clearly understood that as a result of that legislation, the only recourse for preventing a shutdown in any basic industry, after failure of mediation, was Congress. Authorization for seizure as an available remedy for potential dangers was unequivocally put aside.

*Id.* at 600 (Frankfurter, J., concurring). There is no such clear legislative history present with respect to the question faced by this Court.[2]

The Court can surmise that legislators who proposed H.B. 643 were uncertain enough about the coverage of the Virginia Freedom of Information Act that they wished the Assembly to clarify its applicability to corporations whose stock is held by the Common-

---

[2] Conversely, in *Railway Labor Executives Ass'n v. Consolidated Rail Corp.*, 580 F. Supp. 777 (D. D.C. 1984), the court addressed the question of whether Conrail, a corporation in which the federal government owned eighty-five percent of the stock, was included within the definition of agency in the Federal Freedom of Information Act. Part of the reason for finding it was not included was the fact that congress had specifically classified Amtrak as a "government-controlled corporation," a term expressly included in the Federal Act's definition of agency. Because no such provision was stated for Conrail, the court found conclusive legislative intent to exclude Conrail from VFOIA coverage. *See id.* at 778, n. 4.

wealth in such large quantities.[3] *Cf., American Civil Liberties Union v. Andrews*, 24 Va. Cir. 443, 450, n. 4 (1991) (court notes that the VFOIA covered "committees and subcommittees," at least of the General Assembly, "even prior to the specific reference to them in § 2.1–341"). Legislative non-action, however, leaves the Court exactly where it would have been had such a bill never been proposed, that is, faced with determining whether prior legislative activity within the freedom of information framework is sufficiently broad to reach such entities as RF&P.

The Virginia Freedom of Information Act applies to all "public bodies," a term defined within the Act. The term includes:

> any legislative body, authority, board, bureau, commission, district or *agency* of the Commonwealth or of any political subdivision of the Commonwealth, including cities, towns and counties; municipal councils, governing bodies of counties, school boards, and planning commissions; boards of visitors of state institutions of higher education . . . . *other organizations, corporations, or agencies in the Commonwealth, supported wholly or principally by public funds* [and] any *committees or subcommittees of the public body created to perform delegated functions of the public body* or advise the public body.

Va. Code Ann. § 2.1–341 (definition of public body incorporated within sections on "meeting" and "public body"). (Emphasis added). It is the emphasized language upon which the Petitioner focuses his attention in attempting to bring RF&P within the definition of "public body."

The Petitioner argues that functionally RF&P is now an agency of the state in the generic sense of the term. He urges the Court to find that when the General Assembly adopted the term "agency," it was thinking "instrumentality" and that "agency" is intended to reflect simply a principal/agent relationship. The logic of this argument flows from the absence of any specific definition of "agency," within the VFOIA. Because of this absence, Respondent RF&P cites

---

[3] Indeed, the proposed amendment would have extended the VFOIA's coverage beyond that asserted by the Petitioner here, extending it even to certain large, pure stock acquisitions, in which the Commonwealth's only interest is in the value of the stock acquired.

to § 2.1–8.2 of the Virginia Code, which, for the purposes of the Chapter on Executive Reorganization, defines "agency" as "any administrative unit of state government" and urges its utilization by the Court. Of course, by its failure to define a term that it has shown it can define for use in other sections of the Code, the General Assembly may have intended courts to adopt the generic agency relationship as the appropriate meaning. The difficulty with that argument, however, is that use of "agency" in its broadest sense makes unnecessary some of the more specific terms also included within § 2.1–341 because most of the other entities listed in that section could be considered agents for their principal, the Commonwealth. Indeed, some of the entities listed in § 2.1–341 form part of the definition of agency offered in § 2.1–8.2. *Compare* § 2.1–8.2 *with* § 2.1–341(a) (the definitions of "agency" in § 2.1–8.2 and of "public body" in § 2.1–341 both refer to "authority," "board," and "commission"). However, the Court is of the opinion that in the context of § 2.1–341, the term "agency" only makes sense if used in a common administrative law setting, referring to administrative agencies. Such a view looks more to the general definition of agency offered by § 2.1–8.2, *see supra*, than to the specific definition offered in the Administrative Process Act, which looks to the "empower[ment] . . . to make regulations or decide cases." Section 9–6.14:4 (1989); *Cf.* § 9–6.14:22(C) ("notwithstanding the definition of 'agency' as provided in § 9–6.14:4 of this chapter, notices for all meetings of state agencies required to be public pursuant to the Virginia Freedom of Information Act . . . shall be published in the [Virginia] Register."). Therefore, the Court is unwilling to find that the legislature intended that private corporations or their boards of directors be included, even in the context presented by this case, within the term "agency" as used in the VFOIA.

The Petitioner next argues that RF&P falls under the VFOIA because it is "supported wholly or principally by public funds." This argument has two branches. First, it is argued that because state funds were used to acquire RF&P stock, the corporation is now supported by those funds. Secondly, it is argued that because the Commonwealth, through VRS, owns one hundred percent of the stock of RF&P, the latter's assets are effectively the Commonwealth's.

While it is true that VRS funds are public funds, *see, Almond v. Day*, 197 Va. 782, 785, 91 S.E.2d 660, 663 (1956), and that those

funds were used to purchase the stock of RF&P, it does not necessarily follow that those funds now support RF&P. The issue can be clarified by examining the capitalization of SHI. Initial capitalization of SHI consisted solely of the shares of RF&P. Because those shares were purchased with public funds, there is no question that SHI is funded "wholly or principally by public funds." However, RF&P's capital account was unaffected by the Commonwealth's purchase of its stock. Funds exchanged for the shares went to the former shareholders, not to RF&P. While the shares now held by VRS, through SHI, reflect the value of the corporation's assets and entitle VRS to share in the profits of RF&P, *see, Carnegie Trust Co. v. Security Life Ins. Co.*, 111 Va. 1, 68 S.E. 412, 417 (1910), they are "wholly distinct from the capital of the company." *Jennings v. Commonwealth*, 98 Va. 80, 84, 34 S.E. 981, 982 (1900). It is true that shares of stock also represent a share of corporate assets to which a shareholder is entitled upon dissolution of a corporation, *see, Carnegie Trust Co.*, 111 Va. at 17, 68 S.E. at 417, but it requires a quantum leap of logic to equate such an interest with the sort of entitlement to which a current corporate creditor may lay claim:

> Shares of stock do not indicate a liability from the corporation to the stockholder. The relation of debtor and creditor does not exist between the [corporation] and the stockholder. The stockholder cannot make the corporation pay him the value of his stock. His right is merely to share in the dividends and in the assets of the corporation upon its dissolution.

P. Vartanian, *The Law of Corporations in Virginia*, § 164 at 325 (1929); *see also, O'Brien v. Socony Mobil Oil Co.*, 207 Va. 707, 717, 152 S.E.2d 278, 285 (1967) ("Undeclared dividends are not a corporate debt. They are an expectancy, ripening into debt only when legally declared.").

In the alternative branch of his argument, the Petitioner argues that because VRS owns one hundred percent of the shares of stock of RF&P, the assets of the company are effectively those of the Commonwealth. However, just as stock ownership does not make a corporation a stockholder's debtor, neither does it create for the stockholder a property interest in corporate assets. "While the shares of stock are property of themselves, this does not mean that the shareholder has the title to a proportionate part of the property of the

corporation. A stockholder has no legal title to the property or profits of the corporation until a dividend is declared or a division made upon dissolution of the corporation." Vartanian, *supra*, § 164 at 325.

No evidence was presented to this Court which would justify a decision to deny recognition of the separation between the assets of a corporate entity and its shareholders. *Cf. Brown v. Margrande Compania Naviera*, 281 F. Supp. 1004, 1005 (E.D. Va. 1968) ("Mere ownership by one individual of all the stock does not make that individual the corporation."). Consequently, it is the opinion of the Court that RF&P is not a corporation wholly or principally supported by public funds.

The Petitioner additionally argues that because RF&P now serves only one master, VRS, it is the functional equivalent of a "committee[] or subcommittee[] of the public body created to perform delegated functions of the public body." *See* Va. Code Ann. § 2.1–341 (definition of "public body"). In order to evaluate this theory fully, the Court must first decide the true nature of the RF&P investment by VRS. In her testimony, Jacqueline Epps, the Chairperson of the VRS Board of Trustees, characterized the stock purchase as primarily an equity investment. As such, VRS's direct interest would extend only to the value of the stock held, although to the extent that the "independent" activities of RF&P affected that value, VRS would have an indirect interest in those activities. However, Buford Scott, the only other trustee who testified at trial, stated that the investment was viewed by the VRS Board of Trustees as primarily one in real estate. Scott's characterization is supported by the fact that the funds used for the purchase of the RF&P stock came from VRS's real estate reserve.

By viewing this investment as one in realty rather than in securities, it becomes apparent that RF&P is effectively serving as an investment manager for VRS. Indeed, the testimony presented demonstrates that a primary reason for VRS's acquisition was its admiration for RF&P's investment skills. Authorized by statute to invest in realty, *see* Va. Code Ann. § 51.1–116, and charged with exercising the investment judgment of a reasonably prudent investor, *see id.*, VRS, with respect to *this* investment, has effectively shifted exercise of *actual* judgment to RF&P.

In *Railway Labor Executives Ass'n v. Consolidated Rail Corp.*, 580 F. Supp. 777 (D. D.C. 1984), the court found that Conrail,

eighty-five percent of whose stock was owned by the federal government, was not a government agency covered by the Federal Freedom of Information Act. The differences between the Federal Act and Virginia's Freedom of Information Act illustrate the difficulties inherent in using one jurisdiction's Freedom of Information Act to aid in interpretation of another's.[4] Nonetheless, some of the basic analysis in *Consolidated Rail Corp.* is useful in understanding why the role currently played by RF&P supports at least limited coverage by the Virginia Act. As discussed earlier, *supra* note 2, while part of the reason for the holding in *Consolidated Rail Corp.* was legislative history, that opinion also notes that Conrail performed no governmental functions. "Providing commuter and freight rail service has traditionally been a function carried out by private industry and remains so today." *Id.* at 778. Although Conrail was created by Congress, *see id.* at 777, it was created with the intention that it would not serve a government function but would eventually become a self-sustaining, independent corporation. *See id.* at 778. The case at bar might deserve a similar analysis were RF&P still actively involved in the railroad business. However, RF&P now exists only as a holder of various investment properties, primarily realty. Accordingly, coverage by the VFOIA is grounded not on the size of the stock acquisition but in the fact that this acquisition effectively allows the Commonwealth to delegate management of the underlying assets for

---

[4] The Virginia Supreme Court noted that difficulty in *Marsh v. Richmond Newspapers, Inc.*, 223 Va. 245, 254, 288 S.E.2d 415, 420 (1982). The difficulty is well-illustrated by a case cited by RF&P in support of its argument. In *Hopf v. Topcorp, Inc.*, 170 Ill. App. 3d 85, 527 N.E.2d 1 (1988), the appellate court found that a trial court had not abused its discretion in denying a temporary injunction to petitioners who sought to force two private corporations to comply with the state's Open Meetings Act. Unlike the Virginia Act, the Illinois statute, in referring to "subsidiary bodies" of governmental entities, focuses either on support by public funds or on the ability to expend tax revenues. *See, id.*, 527 N.E.2d at 4 (citing Ill. Rev. Stat., ch. 102, para. 41.02). Thus, while the *Hopf* court engages in some discussion about whether the corporations involved perform a public function (finding that they performed only proprietary functions), *see id.*, 527 N.E.2d at 5, the debate is less relevant than it would have been in the context of the Virginia Act, which looks to "delegated functions of the public body." *See* Va. Code Ann. § 2.1–341. A dissenting opinion in *Hopf* essentially seeks to read the Illinois Act as similar in intent to that of Virginia, by focusing on the apparent public function served by the two corporations. *See Hopf*, 527 N.E.2d at 12 (Pincham, J., dissenting).

a statutorily mandated purpose, i.e., pension fund investment. *See* Va. Code Ann. § 51.1–116.

On the other hand, as RF&P has pointed out, mere realignment of responsibilities is insufficient to bring an otherwise private entity within the coverage of the VFOIA. The definition of "public body" within § 2.1–341 includes "*committees* or *subcommittees* of the public body *created* to perform delegated functions of the public body." Section 2.1–341 (emphasis added). RF&P's argument focuses on the fact that RF&P was created in the previous century and existed as a private entity whose stock was acquired by VRS. The parties apparently agree that had VRS created RF&P and instructed RF&P to go forth and obtain (and manage) real estate investments for VRS, then this *created* RF&P would be a "public body" under the VFOIA. RF&P argues, however, that it was not created by VRS action; indeed, RF&P was engaged in the same activities, in the same manner, the day before the one hundred percent stock acquisition by VRS as it was the day after that acquisition. RF&P's position is grounded in a fundamental principle of corporate law, that a veil separates a corporation from its shareholder owners.

The Petitioner acknowledges the presence of this veil but suggests that public policy considerations can make that veil friable. The Court agrees that when policy considerations require it, a court may closely scrutinize a corporate form.

> [W]hen the facts justify it, the courts will look beyond the mere corporate entity to the persons who compose the corporation. This rule is applicable, wherever reason and justice require it, although the acts of the parties amount to constructive fraud only. . . . While the legal conception of a corporation distinct from its members has often been regarded as a mere fiction adopted by the law for the purpose of enabling natural persons to transact business in this peculiar way, whenever it is necessary to do so, the law will look behind the corporate body and recognize the members and disregard the fiction.
>
> In the case of the one-man corporation or the corporation in which all stock is owned by a single individual . . . courts have shown great liberality in lifting the veil of the corporate entity and holding the sole shareholder and the corporation to be one and the same. Where a corporation is so

organized and controlled as to become the mere agent or instrumentality of another corporation, the courts have laid down the rule that the doctrine of corporate separateness may be ignored.

*Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 31–32, 147 S.E.2d 747, 753 (1966). Part of the logical attractiveness of RF&P's argument, that its corporate form should be fully recognized, lies in RF&P's long history as a private corporation. Generally, cases resulting in a piercing of the corporate veil involve corporate arrangements that are suspect from their formation. It would be difficult to declare a corporate arrangement invalid *merely* because all of its stock was later acquired by one owner.

The Petitioner characterizes RF&P as a government entity because one hundred percent stock ownership effectively allows VRS to control RF&P as completely as any governmental body controls any subsidiary. This argument gives the Court pause. However, the legal fiction of the corporate entity makes difficult any argument by the Petitioner that RF&P is now merely the alter ego of the Virginia Retirement System. Nonetheless, the court believes that the Petitioner, at least implicitly, relies upon a more tenable argument than one of corporate alter ego. The Petitioner need not remove completely the corporate veil; he only need demonstrate that the Virginia Freedom of Information Act may, in certain corporate contexts, gently lift the veil.

In *Lewis Trucking Corp.*, 207 Va. 23, 147 S.E.2d 747, an effort to avoid a license tax obligation was nullified by the court's refusal to accept the integrity of the corporate veil. As in that case, in which the corporate structure was not allowed to nullify "established policies of law," *id.* at 31, 147 S.E.2d at 753, in this case, corporate structure will not entitle VRS to avoid the policy established by the General Assembly in the VFOIA. However, recognizing the applicability of the VFOIA does not require this Court to deny the legitimacy of the current corporate arrangement. It merely requires that the Court look realistically at the relationship between the managing boards of VRS, SHI, and RF&P.

The General Assembly has mandated that the Virginia Freedom of Information Act shall "ensure . . . free entry to meetings of public bodies wherein the business of the people is being conducted." Va. Code Ann. § 2.1–340.1(A). Furthermore, it mandates that the

VFOIA shall be liberally construed to achieve that goal. *See* § 2.1–340.1(B). In *Roanoke City School Board v. Times-World Corp.*, 226 Va. 185, 307 S.E.2d 256 (1983), the Virginia Supreme Court acknowledged that statutory mandate. *Id.* at 191, 307 S.E.2d at 258. However, the court added that the judiciary is limited to *determining* the content of legislation and that the liberal construction language cannot authorize a court to *supply* that content. *See id.* at 191, 307 S.E.2d at 258. Because the statute at that time failed to refer to telephone communications, the Virginia Supreme Court was compelled to find that the legislature had intentionally omitted such communications from the coverage of the VFOIA. *Id.* at 191, 307 S.E.2d at 258–59. This Court is faced with no such omission. By referring to "corporations . . . in the Commonwealth, supported wholly or principally by public funds," Va. Code Ann. § 2.1–341 (definition of "meeting"), and to "committees or subcommittees of the public body created to perform delegated functions of the public body," *id.* (definition of "public body"), the General Assembly has given sufficient breadth to the VFOIA's coverage to reach private corporations whose sole function is one which, were it not for delegation of that sole function, would be performed by a public body. "Committees" need not be specifically designated as such, for it is a generic term. *Black's Law Dictionary*, to which the Supreme Court referred in *Roanoke City School Bd.* as support for its conclusion that the notion of "meeting" required some physical presence, *see, Roanoke City School Bd.*, 226 Va. at 192, 307 S.E.2d at 259, defines "committee" as "an assembly or board of persons, to whom the consideration, determination, or management of any matter is committed or referred." An alternative definition, perhaps even closer to the arrangement here, describes a "body to whom others have delegated or committed a particular duty, or who have taken on themselves to perform it in the expectation of the act being confirmed by the body they profess to represent or act for." *Black's Law Dictionary* 341–42 (4th ed. 1968). *Webster's Dictionary*, which the *Roanoke City School Board* opinion also cited, *see* 226 Va. at 192, 307 S.E.2d at 259, defines "committee" as "a group of people elected or appointed to attend to any matter or business referred to them." *Webster's New Twentieth Century Dictionary* 365 (2d ed. 1983). Using these definitions, the Court views the Board of Directors of RF&P, in its current form, as a body "to whom the consideration, determination, or man-

agement of any matter is committed." *See, Black's Law Dictionary*, 341–42 (definition of "committee"). To find otherwise would make a mockery of the VFOIA's mandated liberal construction. It would allow a public body to avoid its obligations under the VFOIA by creating sub-entities and characterizing them as anything but committees or sub-committees.

The testimony received by this Court indicates that with acquisition of *all* RF&P stock by VRS, all members of the RF&P Board of Directors who had represented former stockholders resigned. Jacqueline Epps and Mark Finn, members of the VRS Board of Trustees, who already sat on the RF&P Board because of VRS's earlier stock holdings in RF&P, *see* Va. Code Ann. § 51.1–151, remained and, as authorized by the RF&P Articles of Incorporation, selected new Board members. Ms. Epps asserts that only in this capacity, as the sole remaining RF&P Board members, did Mark Finn and she select the new members. However, the Court need not ignore reality. A judge may see only with Chief Justice Marshall's "judicial eyes," *see, United Sates v. Wilson*, 32 U.S. 150, 161 (1833), but those eyes need not be myopic. Ms. Epps is Chairperson of the Board of the Virginia Retirement System, and Mr. Finn is a member of that Board. When VRS chose to set up SHI as a holding company for stock acquisitions, Epps and Finn were designated members of SHI's Board of Directors; until November of 1991, they were the only members of that Board. In effect, they formed a subgroup or committee of the VRS Board of Trustees. Their committee status did not change when they augmented the SHI Board by adding one additional member in November of 1991. Solely because of their positions with VRS and SHI are both Jacqueline Epps and Mark Finn members of the RF&P Board of Directors. Again, in effect, they formed a subgroup or committee of the VRS Board of Trustees. Shrouding, but not obliterating, the actual committee relationship is the fact that these "committees" were seated at the heads of corporations as Boards of Directors.

RF&P would have the Court conclude that, once a corporation is isolated from the VFOIA, then so must be its Board of Directors. However, the "committee and subcommittee" language in the VFOIA clearly prevents a public body subject to the Act from avoiding its obligations under that Act by separating into subgroupings made up of members of the parent group and, thereafter, delegating

authority to these subgroups while declaring them immune to the VFOIA.[5] As a practical matter, although a corporation has a separate legal existence, the people who give actual life to the corporation may have other affiliations, and those affiliations may result in obligations under the VFOIA. Thus, in addition to the concession made at the March 29–30, 1992, hearing that SHI was a "public body" because of its funding, the SHI Board of Directors is in reality a mere committee or subcommittee of the VRS Board of Trustees and, because it has responsibilities delegated by VRS, falls within the definition of "public body."

Additionally, Mark Finn is now Chairman of the RF&P Board of Directors, and Jacqueline Epps is a member of that Board. Contradicting her testimony that Mr. Finn and she selected the RF&P Board members purely in their roles as RF&P Board members, Ms. Epps testified that, following the acquisition of one hundred percent of the RF&P stock by SHI through VRS, Finn and she, as Directors of SHI, were authorized by the VRS Trustees to select all the new members of the RF&P Board of Directors. This Court declines to recognize in Ms. Epps' and Mr. Finn's Board memberships a form of legal schizophrenia that would render them capable of serving these intertwined entities in purely separate capacities. When Jacqueline Epps and Mark Finn selected the new Board of Directors of RF&P following the one hundred percent stock acquisition by VRS, they effectively, on behalf of VRS and SHI, created a new committee or subcommittee of VRS and SHI, seeking to protect it from the VFOIA by anointing it as the new Board of Directors of RF&P.[6] While it is quite clear that the SHI Board of Directors is subject to the VFOIA, just as is the

---

[5] Similar concerns are addressed, perhaps more directly, in the Iowa Code. "A government body shall not prevent the examination or copying of a public record by contracting with a nongovernment body to perform any of its duties or functions." Iowa Code Ann. § 22.2(2) (West 1992).

[6] By way of comparison, the Court notes that in *Hopf v. Topcorp, Inc.*, 170 Ill. App. 3d 85, 527 N.E.2d 1 (1988), discussed *supra*, a key factor in the appellate court's affirmation of a lower court's refusal to subject private corporations to the Illinois Open Meetings Act was the latter's finding that the corporations' boards were completely separate and independent from direct government control. *See id.*, 527 N.E.2d at 5. This finding was critical because under the Illinois Act, the term "subsidiary bodies" was taken to mean bodies substantially controlled by the government. *See id.*, 527 N.E.2d at 4. However, under the Virginia Act, control is no more important than the delegation of governmental functions. *See* Va. Code Ann. § 2.1–341.

VRS Board of Trustees, the status of the RF&P Board is not as clear due to the fact that it is composed of some members who do not occupy positions with either the SHI or VRS Boards. Nonetheless, it is the Court's opinion that because the VRS and SHI Boards together authorized and selected the current RF&P Board membership, the result is the same.

In essence, the Court's ruling here prevents the Respondents from gliding in and out of different rooms and seeking to dictate their vulnerability to the mandates of the VFOIA simply by which room they occupy. In *People v. Barr*, 78 Ill. App. 3d 842, 397 N.E.2d 895 (1979), *aff'd*, 83 Ill. 2d 191, 414 N.E.2d 731 (1980), a group of city council members met privately prior to a city council meeting and discussed issues that were to be considered at a subsequent council meeting. In the context of the Illinois Open Meetings Act, the court found that this effort to avoid the Act's purpose by separating into a separate group must fail:

> The purpose of the Open Meetings Act is clear and unambiguous. The people's representatives must meet openly, or else the people risk having their business done in secret, with the possibility that private deals will supplant the public interest. *Characterizing a meeting as a political caucus should not distract attention from the real purpose of the meeting.*

*Id.*, 397 N.E.2d at 898 (emphasis added). Similarly, the Boards of the defendants here cannot avoid their VFOIA obligations by breaking into arguably excluded subparts and then conducting what would be public business contemplated by the Act were it conducted within the parental framework.

The RF&P Board of Directors has attempted to satisfy their interpretation of the public's need to know, and, therefore, the legislative intent of the VFOIA, by offering evidence that there is now in place a mechanism by which the VRS trustees, along with members of the General Assembly and VRS beneficiaries, will be provided with "financial and other significant information" by the RF&P Board. While this arrangement might cleverly obscure obligations under the VFOIA, it does not relieve them of those obligations. Rather, it simply serves to illustrate the degree to which the interests of VRS, SHI, and RF&P are now entwined. Because the RF&P Board is subject to the VFOIA, it is not entitled to select its own means of making pub-

lic information available; it is subject to the dictates of the Freedom of Information Act.

The Court finds that the RF&P Board of Directors was effectively created as a committee to perform VRS's function of investing for the state employee retirement plan; therefore, the Board is a public body subject to Virginia's Freedom of Information Act. Whether other subparts of RF&P are subject to the VFOIA will depend upon their relationship to the RF&P Board, or to that Board's parents, SHI and VRS. Such decisions will turn upon whether such subparts have "public" responsibilities effectively delegated by the Board, thus bringing them within the contemplation of the VFOIA. The "common sense" approach to the VFOIA urged by Judge Markow in *Students for Animals v. Rector and Board of Visitors*, 12 Va. Cir. 247 (1988), applies here as well. Although Judge Markow looks for an "independent status," *id.* at 249, which is no longer applicable because of the 1989 amendment that rewrote the "public body" definition, *see* 1989 Va. Acts 491–92 (adding the "committees or subcommittees" language), his reference to "statutorily imposed governmental responsibilities," 12 Va. Cir. at 249, remains germane.

The statutorily mandated responsibility at issue here involves investment for the benefit of state employees and retirees. *See* Va. Code Ann. § 51.1–116. The Court has found that the VRS Board of Trustees has effectively delegated a portion of that responsibility to the Board of Directors of RF&P. Where VRS or SHI, through its functionary, the RF&P Board, further delegates portions of that investment responsibility to other entities within the overall corporate scheme, then those "subcommittees" will themselves be susceptible to the Virginia Freedom of Information Act. It seems likely, for example, that wholly-owned subsidiaries of RF&P effectively engaged in investment matters for the benefit of VRS will also be subject to the VFOIA.[7] Where RF&P sub-entities merely exercise non-discretionary responsibilities only tangentially related to the public responsibility at issue here, then they, like the Animal Research Committee in *Students for Animals*, will not be subject to the VFOIA.

---

[7] This is particularly true where, as is the case with VRS, SHI, and RF&P, there are shared Board memberships. For example, both Ms. Epps and Mr. Finn also sit on the Boards of RF&P Properties, Inc., Richmond Land Corporation, and RF&P Development Corporation, all subsidiaries of RF&P.

The Court is mindful of RF&P's (and VRS's) concern regarding the business implications of a finding that the corporation is in any way subject to the Freedom of Information Act. Its primary concern involves elements of confidentiality sometimes necessary in arranging real estate transfers. Although such considerations are not critical in a *judicial* determination of what entities are included within a legislative act, the Court does note that sufficient exceptions are built into the VFOIA to allow secrecy, where necessary. Section 2.1–344(A)(3) authorizes public bodies to hold closed sessions when, among other things, matters involving the disposal of publicly held property or the use or acquisition of realty for a public purpose are to be discussed and such discussions could affect the value of such property. Section 2.1–344(A)(6) also authorizes such executive sessions when discussions involving the investment of public funds might adversely affect the financial interests of the involved governmental unit. Additionally, § 2.1–342(B)(6) exempts various records and memoranda prepared in conjunction with any matter properly considered in executive session. Section 2.1–342(B)(35) expressly exempts "[a]ppraisals and cost estimates of real property subject to a proposed purchase." Hence, the confidences sometimes necessary in investment management need not be incompatible with the public interest inherent in management of state pension funds. The Virginia Freedom of Information Act raises disclosure to a public right, while ensuring that this statutory right does not serve to erode the very management and investment decisions for which public accountability is mandated.

II. *Has the Virginia Retirement System denied the Petitioner any of his rights under the Virginia Freedom of Information Act, and if so, is the injunctive relief sought by the Petitioner appropriate?*

The standing of the Petitioner to bring suit for violation of the Freedom of Information act is limited to allegations of violations that "denied [him] the rights and privileges conferred by [the VFOIA]." *See* § 2.1–346. Accordingly, in considering whether the entities involved here violated the VFOIA, this court has jurisdiction to consider only those allegations that resulted in a denial of some right or privilege the Act conferred on the Petitioner.

The Petitioner has presented undisputed evidence to show that at least one member of the VRS Board of Trustees has never received a copy of the Virginia Freedom of Information Act as required by

§ 2.1–341.1. Furthermore, the Petitioner has shown that on one occasion, the Chairperson of the Board of VRS, Jacqueline Epps, initially refused to allow photographs to be taken at a Board of Trustees meeting. Although such evidence may be relevant in evaluating the willfulness of any violations, these violations did not deny the *Petitioner* any right or privilege under the VFOIA; therefore, they are irrelevant to whether VRS violated the Act with respect to this Petitioner.

The Petitioner alleges that on February 19, 1992, the VRS Investment Advisory Committee excluded a member of the public from its meeting before properly going into executive session.[8] The basis for this claim is the testimony of the Petitioner's representative who attended that meeting and a tape recording made by her which reveals that she turned off the tape recorder and left before a formal motion was made to go into executive session. All parties concede, however, that the appropriate procedure was followed shortly after the representative left the meeting. Remaining in dispute is whether she was "asked" to leave or left voluntarily because she thought herself obliged to do so. The Court finds the evidence insufficient to support the allegation of even this de minimis violation.

The Petitioner introduced evidence to show that notices of meetings, sent out by VRS in response to requests, do not contain certain "public comment" language required by § 2.1–343.[9] Although the evidence supports the Petitioner's claim, the omission amounts to only a technical violation, due in part to the VRS Chairperson's admitted unfamiliarity with all the requirements of the VFPOA. Standing alone, this violation does not necessitate the Court's granting the requested injunctive relief because the VRS Chairperson is now aware of the requirement.

Additionally, the Petitioner alleges that he failed to receive notices of VRS Board of Trustees meetings as he requested. On May 24, 1990, and again on February 8, 1991, pursuant to § 2.1–343, the

---

[8] The Court notes that this allegation is of questionable relevance, except perhaps with respect to the willfulness question, as it occurred after the Petitioner filed his suit alleging that he was denied certain rights and privileges under the VFOIA.

[9] "Notices for meetings of public bodies . . . on which there is at least one member appointed by the Governor shall state whether or not public comment will be received at the meeting, and, if so, the approximate points during the meeting public comment will be received." Va. Code Ann. § 2.1–343 (Supp. 1992).

Petitioner formally requested continuing notice of all meetings of the VRS Board of Trustees and "all committees and subcommittees thereof." In response to these requests, he was given notices of VRS Board of Trustees meetings and meetings of the VRS Investment Advisory Committee, the VRS Real Estate Advisory Committee, and the VRS Audit Committee. At issue is whether his requests should be construed as including a request for notice of other subsidiaries of VRS, such as SHI and RF&P. Because the Court has found that, in the liberal construction context of the Virginia Freedom of Information Act, the terms "committees and subcommittees" can include the Board of Directors of otherwise private corporations to whom governmental responsibilities are delegated and because the Petitioner's request tracks the "committees and subcommittees" language upon which that ruling was based, the Court finds that his requests obligated VRS to provide him with notice of meetings of both the SHI Board of Directors and the RF&P Board of Directors.

It is perhaps significant that once SHI acknowledged its obligations under the VFOIA, VRS began sending notices of SHI Board meetings to the Petitioner. However, VRS disputes any inference that its decision to send notices reflected a recognition that the Petitioner's requests actually reached SHI. Rather, it argues, this decision was more related to knowledge of impending litigation over these issues. Nonetheless, the Court finds that the context of the requests and the language used support its finding that the requests were sufficient to reach the corporate sub-entities of VRS. There is insufficient basis, however, upon which the Court can find that VRS's failure to give notice was a willful violation of VFOIA requiring injunctive relief. This conclusion is supported by the fact that notice of SHI meetings is now being given.

The Petitioner alleges that a November 4, 1991, meeting, characterized by Ms. Epps as a meeting of the SHI Board of Directors to which all trustees of VRS were invited and attended, was actually a meeting of the VRS Board of Trustees, for which he should have been given notice. The Court agrees. During the March 29–30, 1992, hearing, there was discussion as to whether that which started as a non-meeting of the VRS trustees effectively became a "meeting" once VRS business was undertaken. The Court finds it unnecessary to answer that question for it is clear that this meeting was both an SHI and a VRS meeting from the very outset.

Ms. Epps describes the November 4, 1991, meeting as simply a meeting at which Mark Finn and she, then the only directors of SHI, were to discuss the hiring of a consultant for SHI. Epps portrayed the invitation to the VRS trustees to attend that meeting as a mere courtesy and described her surprise that all actually attended. The Court is of the opinion that attendance by all VRS trustees reveals that they were, at least at that time, more cognizant of what matters constituted VRS business than was the "surprised" Chairperson. It is incongruous to the Court, given the relationship between SHI and VRS, that anyone would seriously argue that SHI business was somehow separate from VRS business. Certainly that was not a view Respondents VRS and SHI espoused before the U. S. District Court for the Eastern District of Virginia less than two weeks before the November 4, 1991, meeting:

> Although SHI is incorporated separately, does have the power to sue and be sued, and can purchase and dispose of property, it does not have unfettered discretion to exercise the full range of corporate powers. To the contrary, it only can acquire and hold property, and it only can do so on behalf of VRS - it *must* remit the entire amount of its income, less expenses to VRS. *SHI exists only to serve a discrete function for VRS, and it can act only on behalf of and for the benefit of VRS.*

Commonwealth Defendants' Brief in Support of Motion to Dismiss at 16, *Kahn v. Virginia Retirement Sys.* (No. 3:91CV00551) (E.D. Va. 1991). (Emphasis in final sentence added.)

The definition of "meeting" in the VFOIA excludes meetings at which "no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, and such gathering or attendance was not called or prearranged with any purpose of discussion or transacting any business of the body or entity." Va. Code Ann. § 2.1–341. In *Nageotte v. Board of Supervisors*, 223 Va. 259, 288 S.E.2d 423 (1982), the Virginia Supreme Court found that a gathering, at which the members of a county Board of Supervisors met in the Attorney General's office to receive information regarding the interplay between certain local and state responsibilities, did not constitute a "meeting" of the Board of Supervisors for VFOIA purposes. *Id.* at 269, 288 S.E.2d at 428. While VRS attempts to characterize the November 4, 1991, meeting as similar to that in *Nageotte*,

the differences are clear. Unlike a meeting between two separate and distinct entities, with separate and distinct areas of responsibility, a meeting involving two inextricably linked entities cannot be said to involve the business of only one of those entities.

Accordingly, the Court finds that the November 4, 1991, meeting was, in addition to its announced purpose as an SHI meeting, also a VRS meeting for which notice should have been given to the Petitioner. Even alone, this would be a substantial violation of the VFOIA. Taken in the context of other VRS violations, *cf., Little v. Virginia Retirement Sys.*, 21 Va. Cir. 248, 258 (1990) ("[T]here is nothing to prevent a judge from considering the violations found in this proceeding in fashioning appropriate relief in the event a future petitioner is able to show that a violation has occurred subsequent to this decision."), this violation takes on greater significance. Additionally, evidence presented which demonstrated other more recent violations of the VFOIA by VRS, although not relevant to specific claims of injury by this Petitioner, suggest a pattern of either willful attempts to avoid the obligations of the Act or flippant disregard that rises to the level of willfulness. Jacqueline Epps testified that she had never read the entire act, a remarkable admission for a VRS Chairperson in light of past VFOIA litigation involving VRS. As a result, she was unaware of the specific notice requirements of § 2.1–343 and was apparently unaware that § 2.1–341.1 required that members of bodies covered by the VFOIA be provided with a copy of the Act. Additionally, she claimed to be unaware of the VFOIA's requirement that public meetings be open to photographers and, therefore, refused to allow photographers of an August 15, 1991, VRS Board of Trustees meeting until the relevant portion of the Act was read to her.[10]

Given this history, which reflects an apparently conscious choice by VRS, through its Chairperson, to err on the side of secrecy when doubt either arises or is created, the Court is of the opinion that collectively the violations demonstrated here were willful, knowing, and substantial. *Cf., Hale v. Washington Cty. School Bd.*, 241 Va. 76, 81, 400 S.E.2d 175, 178 (1991) (holding that court must find a will-

---

[10] The Court notes with some concern Ms. Epps's testimony, if true, that she received advice from the Attorney General's office supporting her belief that she did not have to consent to the taking of photographs.

ful, knowing, and substantial violation of the VFOIA in order to infer that future violations are likely enough to justify injunctive relief). Therefore, injunctive relief is appropriate. Accordingly, the Court will issue an injunction directing VRS to refrain from holding any further meetings of its Board of Trustees, or committees or subcommittees of the Board, as recognized in this opinion, without complete compliance with *all* requirements of the Virginia Freedom of Information Act. Additionally, while the Court cannot order VRS to produce minutes of a meeting which do not exist, *see, Hale v. Washington County School Bd.*, 241 Va. at 81, 400 S.E.2d at 177 (citing Va. Code Ann. § 2.1–342(A)(4)), it will order VRS to make available to the public, including the Petitioner, records and other memoranda, not legitimately exempted under the VFOIA, which arose from the November 4, 1991, VRS/SHI meeting. The Court trusts that this judicial encouragement will bring VRS into full compliance with the requirements of the Virginia Freedom of Information Act without further need for costly litigation paid for by state employees and other state taxpayers.

III. *Has Systems Holding, Inc., denied the Petitioner any of his rights under the Virginia Freedom of Information Act, and if so, is the injunctive relief sought by the Petitioner appropriate?*

Although SHI now concedes that it is subject to the VFOIA, the Court considers it useful to analyze the basis for that concession. In general, SHI wishes to ground its concession in the nature of its funding. Because SHI was fully capitalized by RF&P stock purchased with state funds, it is a "corporation . . . supported wholly or principally by public funds." *See* Va. Code Ann. § 2.1–341. Additionally, like the Board of Directors of RF&P, the Board of Directors of SHI is truly a "committee or subcommittee" of the VRS Board of Trustees, with functions delegated by the VRS Board. Until a third director was added in November of 1991, both directors of SHI also were members of the Board of Trustees of the parent, VRS. Therefore, although this point was certainly not conceded by the defendant, SHI is reached by the VFOIA not only because of its funding but because of its function and position with respect to VRS. Before SHI was capitalized with the RF&P stock, it was a corporation without funds, and therefore without funding, public or otherwise. Even if one does not accept the view that such an impoverished corporation, created by a state entity to perform public functions for the entity,

constitutes a "committee or subcommittee" with delegated functions of a public body, certainly in the context present here, the Board of Directors of SHI was a "committee or subcommittee" of the Board of Trustees of VRS.

In part, the allegations of SHI violations of the VFOIA are based upon the previously-discussed failure of the Petitioner to receive notice of SHI meetings. However, the requests seeking notice of meetings of the VRS Board of Trustees, and all committees and subcommittees of the Board were addressed only to VRS. Although the Court has found that those requests obligated VRS to give notice of meetings of the Boards of SHI and RF&P, as committees or subcommittees of VRS, the requests did not obligate each committee or subcommittee to duplicate that notice. Consequently, the absence of a request for notice specifically addressed to SHI precludes a finding that SHI violated the VFOIA by failing to give notice.

The Petitioner has argued that § 2.1–346 allows him to bring such an allegation whether or not he has requested notice.[11] The Court does not share that interpretation. The right to notice granted to citizens is predicated upon a request for notice. *See* § 2.1–343. Although § 2.1–346 means that requesting notice is not a condition precedent to bringing suit for VFOIA violations, under § 2.1–343, requesting notice remains a condition precedent to the statutory right to notice. To adopt the Petitioner's view is to allow § 2.1–346 to create an additional right not conferred elsewhere in the VFOIA, the right of all citizens to notice of meetings without first requesting such notice. *Cf., American Civil Liberties Union v. Andrews*, 24 Va. Cir. 443, 457 (1991). ("Just as there is no common law right of the public or press to *attend* the meetings of governmental bodies, there is also no common law right of the public or press to receive *notice* of such meetings.") (Emphasis in original).

Other violations by SHI alleged by the Petitioner are generally admitted by that defendant. It is conceded that SHI Board meetings held prior to December 17, 1991, were closed to the public, in viola-

---

[11] The relevant language in § 2.1–346 reads, "Failure by any person to request and receive notice of the time and place of meetings as provided in § 2.1–343 shall not preclude any person from enforcing his or her rights and privileges conferred by this chapter."

tion of § 2.1–343,[12] and that prior to that date, minutes were not kept of such meetings, as required by the same Code section. The Court recognizes that the status of the SHI Board of Directors as a "committee or subcommittee" of VRS for VFOIA purposes was not obvious prior to the Court's ruling. Therefore, were that the only basis for finding that the VFOIA covers SHI, the Court could not find that the violations were willful. However, because of its public funding, SHI has now conceded its VFOIA coverage. That public funding is obvious. As a result, coverage of SHI by the VFOIA is so evident that it is difficult for the Court to believe that these violations were entirely inadvertent. Inadvertence seems even less likely given the close identity between the SHI Board of Directors and the VRS Board of Trustees, particularly given the latter's history of VFOIA violations.

However, although the violations involved here were substantial, it is unnecessary for the Court to determine whether they were willful because specific injunctive relief is unnecessary. Since injunctive relief will be directed at VRS and all its committees and subcommittees, SHI is already effectively included within that injunctive umbrella.

IV. *Has RF&P Corp. denied the Petitioner any of his rights under the Virginia Freedom of Information Act, and if so, is the injunctive relief sought by the Petitioner appropriate?*

Having now found that the Board of Directors of RF&P is subject to the Virginia Freedom of Information Act, the analysis regarding violations is essentially identical to that for SHI. There is no evidence before the Court that the Petitioner requested notice of RF&P meetings *from RF&P*, and therefore, no violation of the notice requirements is found.

However, by its own admission, RF&P, like SHI, has failed to open its Board of Directors meetings to the public and has failed to

---

[12] Presumably, the section mandating public meetings creates a right granted to all citizens and differs from other rights or privileges granted by the VFOIA in that violation of the section gives rise to a *per se* denial of that right to any citizen. *Cf., American Civil Liberties Union*, 24 Va. Cir. at 459 (1991). (Fact that there was no evidence that any citizen was *actually* excluded from meeting of members of General Assembly served as *evidence* that meeting was public but did not preclude petitioner from attempting to show that meeting was actually held in relative secrecy).

keep minutes of those meetings. The Court holds that unlike the violations of SHI, the violations of the RF&P Board were the result of a reasonable and good faith belief that the VFOIA did not apply to any portion of RF&P. Consequently, it would not be appropriate to impose injunctive relief against RF&P. Once again, however, the Court observes that the injunctive relief granted against VRS extends to all its committees and subcommittees and, therefore, also touches the RF&P Board.

## V. *Has Jacqueline Epps, in her individual capacity, willfully violated the Virginia Freedom of Information Act?*

Section 2.1–346 of the VFOIA allows a court to impose a fine upon members of public bodies found to have "willfully and knowingly" violated the terms of the Act. Violations of the VFOIA, standing alone, will not support imposition of a civil penalty. *See, Nageotte v. Board of Supervisors*, 223 Va. 259, 269, 288 S.E.2d 423, 428 (1982).

As discussed earlier, many of the violations of the VFOIA by VRS, both those of consequence and those of less significance, flow from the Chairperson's unwillingness to familiarize herself with the substance of the Act. Although Jacqueline Epps testified that she has taken affirmative steps to ensure that VRS complies with the VFOIA, the evidence suggests otherwise. The technical violations are of minimal concern here, but the machinations associated with the creation of SHI to hold RF&P stock suggest an effort to avoid compliance with the VFOIA. Indeed, although Ms. Epps testified that a primary motive in choosing the existing structure was to shield pension funds from judgments which might theoretically be obtained against RF&P, she also testified about a prevailing belief that RF&P would have trouble attracting a "highly qualified" CEO were it subject to the VFOIA. This latter view suggests a desire to avoid the VFOIA mandates.

The Court concludes that Ms. Epps's overriding attitude toward the VFOIA was one of hostility, and that, therefore, she encouraged and otherwise willfully participated in efforts to avoid its obligations. This is primarily true with respect to her individual role within VRS and SHI. Her activities within VRS, as its Chairperson, tainted not only that entity's approach to the VFOIA, but the approaches of SHI and the Board of Directors of RF&P. Only with respect to the latter did her view of the VFOIA's non-applicability have any real

merit. The Court, therefore, concludes that she individually violated the VFOIA and that her violations were willful. Accordingly, she will be ordered to pay $250 to the State Literary Fund.

VI. *Are any of the parties in this suit entitled to an award of attorney fees?*

The Petitioner has substantially prevailed on the merits of his suit and, therefore, is entitled to his "costs and reasonable attorney's fees" from the public bodies involved. *See* Va. Code Ann. § 2.1–346. However, the Court has discretion in this matter. *See Nageotte*, 223 Va. at 270, 288 S.E.2d at 428. It is primarily the peculiar relationship between the Board of Directors of RF&P and the Boards of SHI and VRS that allows the Court to find that the RF&P Board is subject to the VFOIA. In the present context, it would be unfair to hold the entire corporation, at whose head the Board sits, liable for the results of that peculiarity. Therefore, the Petitioner's reasonable costs and attorneys' fees are to be paid by VRS and SHI.[13]

November 17, 1992

Following this Court's rulings set forth in the letter opinion of August 5, 1992, the parties filed several motions. Respondent Jacqueline Epps filed a Motion to Reconsider asking that the Court reverse its finding that she had willfully and knowingly violated the Virginia Freedom of Information Act. Petitioner George B. Little filed a motion to make the discovery depositions of Jacqueline Epps and Buford Scott part of the court record. Respondents opposed that motion and filed their own motion to seal the depositions from public view. Finally, the Petitioner submitted his Request for Attorneys' Fees, a request which was opposed on various grounds by Respondents Virginia Retirement System and Systems Holding, Inc. All motions were addressed at a hearing on October 14, 1992. For the reasons set forth below, the court will deny Respondent Jacqueline Epps's Motion to Reconsider; will deny the Petitioner's Motion to Make the Depositions Part of the Court Record; will deny Respondents' Motion for a Protective Order; and will award the Petitioner

---

[13] In ruling this way, the Court is acknowledging the validity of the corporate structure involved here but also recognizes that the net result is similar regardless of against whom the fees are assessed. Any assessment against RF&P would eventually flow indirectly to VRS and SHI through its RF&P stock holdings.

attorneys' fees in the amount of $120,097.45 and costs of $13,073.10.

## Motion to Reconsider

Respondent Jacqueline G. Epps has asked this Court to reconsider its finding as discussed in the Court's letter opinion of August 5, 1992, that she had willfully and knowingly violated the VFOIA. The Court found willful and knowing violations both in her role as Chairperson of the VRS and in her role as a Director of SHI. Pursuant to Virginia Code § 2.1–346.1, the Court imposed a fine of $250.00 on Ms. Epps.

The crux of the Respondent's argument is that the evidence is insufficient to support the court's finding that she willfully *and* knowingly violated the VFOIA. The Court recognizes that this would be much clearer were there stronger evidence that Ms. Epps had violated the VFOIA in full knowledge of, and without regard to, such violations. Indeed, the Respondent argues that her uncontradicted testimony that she was unaware of any violations is fatal to a charge that she willfully and knowingly violated the VFOIA.

Before addressing the substance of the Respondent's theory, it is necessary to address a procedural argument. The Respondent contends that the standard of proof in cases involving willful and knowing violations under § 2.1–346.1 should be "clear and convincing." In support of that contention, she cites several cases involving non-monetary penalties. However, such cases all involve proceedings in which the *primary* penalties involved are accurately described as "highly penal in nature." *See, Commonwealth v. Malbon,* 195 Va. 368, 379, 78 S.E.2d 683, 689 (1953) (Virginia Supreme Court requires "clear and convincing" evidence to support removal of a sheriff from office.) *Addington v. Texas,* 441 U.S. 418 (1979), cited by the Respondent, required "clear and convincing" evidence to support involuntary commitment because a "significant deprivation of liberty" was involved. *See id.* at 425. *Santosky v. Kramer,* 455 U.S. 745 (1983), required "clear and convincing" evidence to support termination of parental rights. *See id.* at 769. *Seventh District Comm'n v. Gunter,* 212 Va. 278, 183 S.E.2d 713 (1971), required "clear proof" to support disbarment of an attorney. *See id.* at 284, 183 S.E.2d at 717.

In the instant case, the statutory penalty is a fine of no more than $1,000.00. *See* Va. Code Ann. § 2.1–346.1. The Respondent points

not to that penalty, but to the tangential injury to reputation which she argues attaches to the Court's finding. This Court does not believe that the feared injuries to a public official's reputation are on a par with the explicit "highly penal" results of the cited cases. The statutory requirements of a finding of a willful and knowing violation, *see* Va. Code Ann. § 2.1–346.1, and the ruling of the Virginia Supreme Court requiring that such violations also be substantial, *see Hale v. Washington County School Board*, 241 Va. 76, 81, 400 S.E.2d 175, 179 (1991), provide sufficient obstacles to a petitioner seeking to impose a penalty upon an individual member of a public body for a violation of the VFOIA. There is no reason to add to that burden by elevating the standard of proof to "clear and convincing."

The Respondent argues that her professed unawareness of violations of the VFOIA prohibits a valid finding by a court that any violations of the VFOIA by her were willful. However, implicit in the notion of "willful and knowing" violations is the principle that violations born of ignorance resulted from a good faith ignorance. *See id.* at 81, 400 S.E.2d at 178 (finding that penalty "unjustified where a public body had acted in good faith"). The Court believes that the evidence demonstrates that the violations involved in the instant case were not the result of an innocent ignorance on the part of Ms. Epps.

In *King v. Empire Collieries Co.*, 148 Va. 585, 139 S.E. 478 (1927), cited by the Respondent, the Virginia Supreme Court, in discussing a provision barring an employee from receiving workers' compensation benefits if he engaged in "willful misconduct," stated, "There cannot . . . be a willful failure to perform an unknown duty. If the duty is unknown, the employee cannot *deliberately* determine that he will not perform it." *Id.* at 590, 139 S.E. at 479 (emphasis added). Accordingly, the court found recovery is not barred by illegal employee conduct, "unless the employer can show that [the employee] had knowledge of the [violated] statute, *or that reasonable steps had been taken to bring home to him notice of its existence." Id.* at 592, 139 S.E. at 479 (emphasis added). That court, therefore, recognized that willfulness need not be grounded in *actual* knowledge but can be based upon a form of constructive knowledge — knowledge a reasonable person would be presumed to possess under similar circumstances. In the case at bar, all that is imputed to Ms. Epps is knowledge that she would have had but for a conscious decision to avoid familiarity with the VFOIA.

· The Court believes that the evidence clearly demonstrates that Ms. Epps consciously chose to remain ignorant of key requirements of the VFOIA. Contrary to her assertion in her Memorandum in Support of the Motion to Reconsider, Ms. Epps's ignorance of the VFOIA reflected more than just an absence of a "photographic memory." Her uncontradicted testimony was that what familiarity she had with the VFOIA arose not from her current position as Chairperson of the VRS, but from a previous position with the Attorney General's Office. Given the public responsibilities which are cast upon agency heads, this continues to strike the Court as a remarkable admission. Although her Memorandum argues otherwise, the ignorance Ms. Epps revealed through her conduct and her testimony was not the result of innocent confusion arising from the complexities of the VFOIA. There is nothing complex about the requirement that members of public bodies be provided with copies of the VFOIA, *see* Va. Code § 2.1–341.1 (1987); there is nothing complex about the motion that public meetings be open to non-interfering photography, *see id.* § 2.1–343 (1992); and there is nothing complex about the requirement that meetings of three or more members of a public body (or two, if that number constitutes a quorum), called to discuss business of that public body, be open to the public unless formally held in executive session, *see id.* §§ 2.1–341, 342–343, 344. As they apply to SHI, there is nothing complex about the requirement that state entities wholly or principally funded by public funds are "public bodies" under the VFOIA, *see id.* § 2.1–341, or the inclusion in the definition of "public bodies" of "committees or subcommittees of [a] public body created to perform delegated functions of the public body." *See id.*

The Respondent argues that evidence of violations of the VFOIA that did not violate any rights of the Petitioner are irrelevant to this case. She is only partially correct. Although the Petitioner, in order to prevail, had to demonstrate that *his* rights had been violated, *see id.* § 2.1–346, evidence of other violations is relevant to the Respondent's state of mind. Her position as Chairperson of a state agency carries with it a certain public responsibility to ensure that the public's interests are recognized and protected. *Cf., Fugate v. Weston*, 156 Va. 107, 140, 157 S.E. 736, 748 (1931) (Prentis, C.J., dissenting) ("Offices are created for the administration of public affairs. When a person is inducted into an office, he thereby becomes

empowered to exercise its powers and perform its duties, not for his, but for the public benefit.'') By intentionally failing to acquire adequate knowledge and appreciation for the VFOIA, the Respondent deliberately avoided one of her public responsibilities. *Cf., Taylor v. Worrell Enter., Inc.,* 242 Va. 219, 224, 409 S.E.2d 136, 139 (1991) (In enacting the VFOIA, ''[t]he General Assembly sought to ensure public access to governmental records and meetings [and] to avoid an 'atmosphere of secrecy' in the conduct of government affairs . . . .'').

While the failure of VRS trustees to receive copies of the VFOIA did represent a violation of the VFOIA, *see* Va. Code Ann. § 2.1–341.1, it was not a violation that infringed any rights or privileges of the Petitioner, nor was it a violation upon which a penalty under § 2.1–346.1 can be based. *See id.* § 2.1–346.1. However, the fact that Ms. Epps was, by her own testimony, unaware of such an explicit provision, aimed clearly at ensuring official knowledge of, and compliance with, the VFOIA, demonstrates the depth of her disregard of the VFOIA. Her own testimony demonstrates sufficient familiarity with the VFOIA to place her on notice of its implications for any state agency and yet, despite this, she failed even to acquaint herself with relevant and obvious requirements of the VFOIA.[14] It was only the onset of litigation and questioning during her deposition in this matter that informed her of the requirements of § 2.1–341.1.

The same flippant disregard of the VFOIA is illustrated by her initial failure to allow photographs at a public meeting of the VRS Board of Trustees held on August 15, 1991. While, like the failure to provide copies of the VFOIA to trustees, this is not a violation of which *this* Petitioner can complain, it too demonstrates the depth of Ms. Epps's indifference toward the VFOIA. In that context, it is less relevant (although the Respondent places great emphasis on this point) that *no* violation occurred, for photographs were ultimately permitted. It *is* relevant that those photographs were only permitted after the newspaper's attorney arrived to read Ms. Epps the relevant portion of the VFOIA. Her post-hoc rationalization for her ''confusion'' — that she saw a distinction between allowing photographs of

---

[14] Additionally, Judge Randall Johnson's findings of technical violations by the VRS, in *Little v. Virginia Retirement Sys.,* 21 Va. Cir. 248 (1990), gave further notice to Ms. Epps of the implications of the Act to her agency, over which she had assumed the role of Chairperson in March of 1990.

"meetings" and "individuals at meetings" — is simply disingenuous. The provisions of Virginia Code § 2.1–343 are clear with respect to photography. Again, as with the statutory provision requiring that members of public bodies be provided copies of the VFOIA, it took the intervention of a third party to acquaint the Respondent with language in the VFOIA with which even a cursory reading would have made her familiar.

Given this background, this Court, in its August 5, 1992, letter opinion, found that the Respondent's failure to recognize that the November 5, 1991, meeting attended by the VRS trustees was not only a meeting of SHI, but a meeting of SHI's parent, the VRS Board of Trustees, arose from her conscious disregard of the provisions of the VFOIA and created a deliberate violation of the VFOIA on her part. Ms. Epps's attempts to parlay her "surprise" at the attendance of the VRS Trustees, in response to her invitation to attend what she characterizes as solely an SHI meeting, into a defense. She primarily argues that because attendance by the VRS Trustees at the November 4, 1991, meeting was not expected, no VRS meeting was effectively scheduled for which notice to the Petitioner would have been required. Given the significance of the RF&P investment to VRS, it strains credulity to believe that the Chairperson of the VRS was truly surprised at the interest shown by the VRS Trustees in the management of that investment. Ms. Epps characterizes SHI as an entity operating at least quasi-independently of the VRS Board, arguing that if the VRS Board was not satisfied with decisions of the SHI Board of Directors, its remedy was to remove those directors. By ignoring the administrative genealogy and direct linkage between the VRS Board and the SHI Board, Ms. Epps sought to justify early efforts to isolate the SHI Board from provisions of the VFOIA, which she knew applied to the VRS Board.

Furthermore, her argument partially rests upon the premise that the November 4, 1991, meeting was an SHI meeting that *converted* to a VRS meeting when all trustees attended and subsequently discussed VRS business. This ignores the finding of this Court that the November 4, 1991, meeting was a VRS meeting from the outset. Contrary to the Respondent's assertion, the Petitioner did not concede that the meeting was solely an SHI meeting; indeed, he suggested, as the Court ultimately ruled, that it was both an SHI and a VRS meeting. Although Ms. Epps apparently viewed SHI as operat-

ing somewhat independently of the VRS, the relationship between the two entities stands firmly in opposition to such a view. The SHI Board of Directors, consisting as it initially did of only two members, both Trustees of the VRS, was nothing more than a "committee or sub-committee" of VRS, and as such was subject to the VFOIA. *See* Va. Code Ann. § 2.1–341. The *entire* SHI corporate entity, once capitalized by the RF&P stock, which was purchased with state assets, also became subject to the VFOIA. *See id.* The attendance by all VRS Trustees at the November 4, 1991, meeting reflects the true relationship between the business of SHI and the business of VRS, Respondent's attempts to separate them notwithstanding.[15] SHI business was VRS business, and once the VRS Trustees were invited to a meeting dealing with such business, a VRS meeting was scheduled, at least within the contemplation of the VFOIA, if not within the contemplation of the VRS Chairperson. Again, it was the Respondent's conscious failure to familiarize herself with the VFOIA which allowed her to create this particular violation. Such conscious failure cannot support a defense based upon a good faith claim of ignorance.

Ms. Epps does not challenge the substantive finding of the Court that she participated in violations of the VFOIA; her defense is that her participation was not "knowing." In *Bank of Martinsville v. Ford*, 219 Va. 942, 252 S.E.2d 354 (1979), the Virginia Supreme Court addressed the definition of "knowingly" in the context of a statute barring a creditor from gaining any benefit from a mechanic's lien if the memorandum in support of that lien "knowingly" included work not actually done or materials not furnished. Noting that the law disfavors forfeiture, the court defined "knowingly" as the "antonym of 'innocently'," as "the synonym of 'designedly,' and 'with intent to mislead'." *Id.* at 945, 252 S.E.2d at 357. The Court believes that the evidence demonstrates that the Respondent's approach to the VFOIA was not one of innocence. She consistently demonstrated a hostile view of the VFOIA, often conceding its requirements only after pressure from external sources. The Court believes that discussions, about which she testified, concerning the

---

[15] This relationship, and the awareness of the defendants of that relationship, is clearly reflected in the pleadings filed in *Kahn v. Virginia Retirement System*, discussed in this Court's letter opinion, *supra*.

status of SHI with respect to the VFOIA reflect not a good faith effort to ascertain that status, but an effort to create a minimally plausible justification for a decision which had already been made — a decision to avoid the VFOIA.[16] While it is true that VRS and SHI began giving notice of SHI meetings to the Petitioner before he filed suit and that SHI meetings held on or after December 17, 1991, were open to the public, such concessions were not made until adverse publicity surfaced in the local press regarding the November 4, 1991, meeting. Despite those concessions, it was not until the opening moments of the March 29, 1992, trial that SHI formally conceded that it was subject to the VFOIA, a position which reasonably should have been conceded long before that date.

The failure to acknowledge the November 4, 1991, meeting as, effectively, a meeting of the VRS Board of Trustees requiring the giving of appropriate notice created a substantial violation of the VFOIA. Additionally, the early failure by SHI to comply with the VFOIA's requirement that meetings of public bodies be open to the public represented another substantial violation. These violations, coupled with SHI's ongoing resistance to conceding its coverage by the VFOIA even after agreeing to comply with the VFOIA's provisions bolster the Court's finding that these violations were not only substantial, but willful.

As Chairperson of the VRS and a common link between the agencies found substantially to have violated the VFOIA, Ms. Epps has only her concerted efforts to avoid knowledge of the VFOIA's obligations to blame for this Court's ruling. The violations by VRS and SHI in which Ms. Epps played a key role were not born of innocent

---

[16] In support of her effort to isolate SHI and RF&P from the Act, Ms. Epps characterized the RF&P investment by VRS as an equity investment. However, the facts belie that claim. The funds for the stock purchase came from the VRS Real Estate Reserve. A document entitled VRS Total Fund Policy Mix, included with the minutes of a December 17, 1991, VRS Board of Trustees meeting, listed the RF&P investment among Real Estate holdings. The concern over appointment of a consultant to SHI to assist in management of the RF&P investment demonstrates an intent by VRS, through SHI, to take more than a passive role in managing the real estate assets that gave value to its investment in RF&P stock. The evidence demonstrates that, like the concerns she expressed over the Act's potential effect on efforts to hire a highly-qualified Chief Executive Officer for RF&P, Ms. Epps believed that it was desirable to avoid the dictates of the Act in order for her and the other directors of SHI to influence the management of the RF&P realty holdings.

mistake or confusion, but of a conscious effort to avoid familiarity with the VFOIA and then ground a defense upon that lack of familiarity.

### Protective Order

Linked to the Respondents' request for a Protective Order is the Petitioner's request that the Court make the depositions of Buford Scott and Jacqueline Epps part of the court record. Although the depositions were submitted to the Court *in camera* in order that rulings could be made on objections to specific deposition questions, they did not thereby become part of the record.[17] Because the depositions, in whole or in part, were not introduced into evidence at the March 29–30 trial, the Court sees no justification for injecting them into the court record at this time. Accordingly, the Petitioner's Motion to Make Discovery Depositions A Part of the Court Record is denied.

Regardless of whether the Court made the depositions part of the record, it would be necessary to address the Respondents' request for a Protective Order sealing the depositions from public view. The Court begins with the observation that it has the authority to seal the depositions at issue and that such an order may be issued more easily for pre-trial discovery material than for portions of a court record. *See, Shenandoah Publishing House, Inc. v. Fanning*, 235 Va. 253, 260–62, 368 S.E.2d 253, 257 (1988). However, the Court notes that in *Shenandoah Publishing House*, the Court's protective concern involved "an essentially private dispute between non-public figures." *Id.* at 259, 368 S.E.2d at 256 (quoting letter opinion of trial court).

When the Court issued its initial protective order with respect to the depositions of Scott and Epps, the rationale for that order was concern that public access to those depositions might expose information involving SHI and RF&P not otherwise available to the public through the VFOIA. This order was a necessary protection during the pendency of the proceedings before this court, proceedings which would ultimately lead to a determination of whether those entities were subject to the VFOIA. That susceptibility now having

---

[17] In order to avoid cluttering court files with unnecessary material, court rules prevent the filing of most depositions with the court clerk unless such filing is directed by the court. *See* Va. S. Ct. R. 4:5(f)(1).

been decided by this Court, the respondents now seek a renewed protective order based upon potential embarrassment they might suffer were the depositions not protected from public view.

In the case at bar, the matters which pose potential embarrassment to the respondents involve not private matters, but public matters related to public responsibilities of public officials. Although in cases analyzing potentially slanderous statements made about public officials, the ultimate considerations are different, for the alleged damage in those cases is already done, the significance of the public nature of public officials remains the same. "An individual who decides to seek governmental office must accept certain necessary consequences of the involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case . . . . [T]he public's interest extends to 'anything which might touch on an official's fitness for office' . . . ." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–45 (1974) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964)).

Buford Scott and Jacqueline Epps are both public officials; their activities and views explored in the depositions involve public bodies subject to the VFOIA. Although not part of the court record which would presumptively be open to public inspection, *see, Shenandoah Publishing House, Inc.*, 235 Va. at 258–59, 368 S.E.2d at 256, the Respondents have pointed to nothing contained within the depositions which would justify this Court's sealing the depositions, thereby preventing those who hold copies from doing with them as they please. Accordingly, the Court will deny the Motion for a Protective Order. The Court's copies of the depositions will be returned to the Petitioner from whom they were received.

### Attorneys' Fees

In his Application for Attorneys' Fees and a Supplement to that application, the Petitioner has asked for attorneys' fees totalling $168,909.85, plus costs of $13,073.10. This amount results from hours spent on this case by not only the nominally *pro se* Petitioner, but by four other attorneys in his law firm. The Respondents, in opposition to a portion of those fees, cite cases addressing the peculiar circumstances which arise when a *pro se* litigant is also an attorney. *See e.g., Key v. Ehrler*, 900 F.2d 967, 970–972 (6th Cir. 1990), *aff'd*, 111 S. Ct. 1435 (1991) (discussing federal cases and the differing approaches taken by various circuits).

One question which arises with *pro se* litigants is whether statutes providing for attorneys' fees contemplate recovery of fees not actually incurred. *See id.* at 971. Although there would appear to be no real difference between attorney and non-attorney *pro se* litigants with respect to the actuality of fees, some courts have justified allowing the former to recover fees based upon the notion of "opportunity costs." "The concept of opportunity costs rests on the assumption that the *pro se* attorney has an otherwise full load of work, and he or she would have been busily billing his clients but for his *pro se* work." *Id.* at 970. *Contra, Aronson v. United States Dept. of Hous. & Urban Dev.,* 866 F.2d 1, 5 (1st Cir. 1989) (refusing to treat *pro se* attorney litigants differently from other *pro se* litigants who also presumably sacrifice some income to pursue their litigation). For the purposes of federal civil rights legislation, the United States Supreme Court has now decided that *pro se* attorney litigants act in the same posture as *pro se* lay litigants — with neither entitled to recover attorneys' fees under 42 U.S.C. § 1988.

> A rule that authorizes awards of counsel fees to pro se litigants — even if limited to those who are members of the bar — would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case.

*Kay v. Ehrler,* 111 S. Ct. 1435, 1438 (1991).

The Virginia Supreme Court has not expressly ruled on the treatment of *pro se* litigants with respect to attorneys' fees in VFOIA suits. *Compare, Nageotte v. Board of Supervisors,* 223 Va. 259, 270, 288 S.E.2d 423, 428 (1982) (court bases denial of attorney fee award on the insubstantiality of violations, rather than the fact that the litigants were *pro se*) *with Hale v. Washington County Sch. Bd.,* 241 Va. 76, 82, 400 S.E.2d 175, 178 (1991) (characterizing the fee ruling in *Nageotte* as grounded in a number of factors, including the petitioners' *pro se* status). However, this Court would be inclined to apply an analysis similar to that used by the United States Supreme Court in *Ehrler.*

This is an issue this Court need not address. The Petitioner here was only nominally *pro se* because, although he appeared in his own

behalf, he was ably assisted by other counsel. To allow him to recover both his *actual* "costs" and his more theoretical *opportunity* costs would be to allow a form of double-dipping. *But see, Brainerd v. Department of the Navy*, 1988 WL 37829, at *1 (N.D. Ill. 1988) (although it ultimately denies an award, court willing to consider both a *pro se* attorney fee and the "cost" of retained counsel). Although the Petitioner has informed the Court of an actual client he represents in this case, that client, by remaining a non-party in the case, is better characterized as a sponsor (albeit one with whom the Petitioner presumably has an attorney-client relationship). Section 2.1–346 of the Virginia Code allows a prevailing petitioner to recover reasonable attorneys' fees; therefore, the Petitioner is entitled to recover *his* fees. He may either do so in his *pro se* posture or he may do so in the same posture as would a lay petitioner represented by counsel, by presenting the fees actually "charged." *Cf., Falcone v. IRS*, 714 F.2d 646, 648 (6th Cir. 1981), *cert. denied*, 466 U.S. 908 (1984) ("A final concern in denying attorneys' fees to *pro se* plaintiffs is the fear of creating a 'cottage industry' for claimants using the [federal Freedom of Information] Act solely as a way to generate fees rather than to vindicate personal claims."). Presumably, since the bulk of attorneys' fees resulted from the work of the attorneys assisting the Petitioner, he would prefer to have the Court consider the reasonableness of those fees. Accordingly, the fee request will initially be discounted by $48,812.40, the amount the Petitioner "billed" himself on behalf of his sponsoring client.

A different treatment is appropriate for fees charged by those attorneys who assisted the Petitioner in his case. James K. Cluverius and Lisa C. Dewey provided some services with fees totalling $1,750.00. Respondents have offered no serious contention to that amount, and there seems to be no reason to dispute the reasonableness of those fees.

J. Burke McCormick and Robyne R. Lau provided yeoman's service to the Petitioner. Although no dispute as to the *legitimacy* of those charges totalling $118,347.45 has been offered, the Court must address the *reasonableness* of those charges in light of the legal issues involved. *See, Tazewell Oil Co. v. United Virginia Bank*, 243 Va. 94, 112, 413 S.E.2d 61, 621 (1992) ("In determining a reasonable fee, the fact finder should consider such circumstances as the time consumed, the effort expended, the nature of the services rendered,

and other attending circumstances.") (quoting *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991)). The violations by VRS were not particularly difficult to demonstrate, although the nature and character of the critical November 4, 1991, SHI/VRS meeting did apparently require some discovery to uncover. Nonetheless, the legal issues, with respect to VRS, were not particularly complex.

Similarly, the legal issues surrounding SHI and its responsibilities under the VFOIA, the Respondents' last-minute concessions notwithstanding, were not tremendously daunting. Had VRS and SHI been the only state entities challenged by the Petitioner, presumably the attorneys' fees would have been significantly lower. Certainly, under those circumstances, fees similar in magnitude to those currently claimed would have shocked the Court's conscience to almost the same degree as was the conscience of the Fourth Circuit Court of Appeals in *Broyles v. Director*, No. 86–1091, slip op. at 6 (4th Cir. Sept. 3, 1992).[18]

Given the manner in which Petitioner's legal expenses were documented, it is difficult to ascertain whether an unreasonable amount is attributable to uncomplicated issues, However, the Court also notes the vigor with which the Respondents and their impressive array of attorneys resisted the Petitioner on even these relatively simple issues. Therefore, the Court is unconcerned by its inability to wield a judicial scalpel to excise "unreasonable" fees generated, in large measure, by the Respondents' similarly unreasonable resistance to Petitioner's meritorious arguments on the simpler issues involving VRS and SHI.

The truly difficult obstacle faced by the Petitioner was convincing the Court that the VFOIA applied to a formerly private entity, RF&P, now made at least quasi-public by the VRS purchase of one hundred percent of the RF&P stock. Although the Petitioner did substantially prevail in that dispute, he did so not *directly* upon any arguments or legal theories presented by him. While the thrust of his argument focused on "public" funding (through the stock purchase), in an

---

[18] In *Broyles*, the Court of Appeals slashed an attorneys' fee award down to $43,000 when over $300,000 had been sought. The Court expressed outrage at such a request given the previous history of litigation involving black lung benefits, including briefs filed earlier in the pending suit that attorneys had spent numerous hours "re-working." *See Broyles*, slip op. at 2–9.

attempt to apply the VFOIA to the whole of the RF&P, the Court's decision relied on the "committee and subcommittee" language of Virginia Code § 2.1–341 to reach only the RF&P Board of Directors. Certainly some of the Petitioner's efforts provided the evidence which formed the basis for the Court's finding, but other efforts resulted in evidence which provided no basis for the finding, and, indeed, pointed in directions toward which the Petitioner was unable to lead the Court.

Because of the wide range of theories upon which the Petitioner based his suit and the narrow approach ultimately adopted by the Court's ruling, the Court questioned whether the total amount of attorneys' fees requested should be discounted by any portion generated by unsuccessful arguments. Having considered the subsequent submissions of the parties on this issue, the Court believes that to discount the fee request on such grounds would contradict the public policy basis behind allowing prevailing petitioners to recover their fees and costs. As noted earlier, the United States Supreme Court observed in *Ehrler* that limiting recovery of attorneys' fees, at least in Civil Rights matters, to those fees which result from actual legal representation encourages the employment of competent counsel, *see Ehrler*, 111 S. Ct. at 1437–38. However, that notion implicitly recognizes a corresponding legislative intent to encourage attorneys to take on meritorious cases.

A similar intent is involved in Freedom of Information Act suits, whether based upon state or federal statutes. "The award of attorneys' fees to successful FOIA plaintiffs was intended to relieve plaintiffs with legitimate claims of the burden of legal costs; it was not intended as a reward for successful claimants or as a penalty against the government." *Falcone*, 714 F.2d at 647 (referring to the federal Freedom of Information Act); *See also Nix v. United States*, 572 F.2d 998, 1007 (4th Cir. 1978) ("This court agrees with the District of Columbia Circuit that an award of attorneys' fees is not automatic but is to be made where doing so will encourage fulfillment of the purposes of FOIA.").

The Court believes that to allow a successful petitioner to recover only fees which directly arose from arguments ultimately adopted by a court would penalize and consequently discourage intellectually aggressive litigation. Were a petitioner required to limit his legal arguments to only those most likely to succeed, in order to avoid

having to bear a significant portion of his own litigation costs, he might, particularly in the face of intellectually or procedurally aggressive governmental opposition, choose not to pursue his claim. Although the United States Supreme Court has recognized that wholly unrelated claims joined in a single suit might not justify a fee award based upon the full costs of litigation when a prevailing petitioner succeeds on less than the whole of his suit, the Court has limited that approach to *unrelated* claims.

In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants . . . counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore, no fee may be awarded for services on the unsuccessful claim.

It may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases, the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the . . . court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally, this will encompass all hours reasonably expended on the litigation . . . . In these circumstances, the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome,

and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983) (citations omitted). Because all the Petitioner's legal theories in the instant case arose from a common nucleus of interrelated facts and because none were unreasonable, his request for attorneys' fees will not be discounted merely because this Court did not ultimately accept or adopt all the approaches urged by the Petitioner.

Additionally, with respect to RF&P, the legal issues involved in Petitioner's suit were unique. Unlike the petitioners in *Broyles*, with respect to black lung benefits issues, the Petitioner here had to plow much of his own ground. *See Broyles*, slip op. at 5–6. Because the Respondents have offered no convincing basis upon which the mathematical reasonableness of the fees sought can be reduced, the Petitioner shall receive the full amount sought, after reduction by the amount which arose from the Petitioner's own activities.

Although the Respondents have expressed some indignation over charges that arose from such activities as cite-checking and Shepardizing, most of that work was performed by an attorney whose hourly rate was only $75.00. While it is true that such work can also be done by a paralegal, the Respondents have offered no basis for the Court to ascertain an amount by which the total amount of the fees sought should be discounted for such work by an attorney.

Finally, the Respondents have voiced further dismay over the totality of the fees sought in light of lesser fees awarded in other Freedom of Information Act suits. The Court is unpersuaded by such protests. Had the Respondents not so vigorously resisted recognition of their responsibilities under the VFOIA, Petitioner's suit presumably would have cost significantly less. Having actively fought the Petitioner through every litigious step, the Respondents now feign amnesia and claim that this was really a simple case justifying only minimal attorneys' fees. The Court suffers from no such amnesia; although it agrees with the Respondents that this case would have concluded with far lower costs, it does not accept the assertion that fault for higher fees rests with the Petitioner. Accordingly, the Petitioner is entitled to recover $120,097.45 in attorneys' fees and $13,073.10 in costs from Respondents SHI and VRS.